**U.S. SOUTHWEST AFRICA/NAMIBIA TRADE & CULTURAL COUNCIL, Appellant,**

v.

**UNITED STATES of America, et al.**

No. 81-2199.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 16, 1982.

Decided May 27, 1983.

Thomas C. Henry, Washington, D.C., for appellant.

R. Craig Lawrence, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Royce C. Lamberth and Patricia J. Kenney, Asst. U.S. Attys., and David L. Bennett, Atty., Federal Aviation Admin., were on the brief for appellees.

Before WRIGHT, WALD and MIKVA, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge: .

We are called upon to review the refusal by an official of the Federal Aviation Administration (FAA) to approve an advertisement as suitable for public display in the various advertising areas at Washington National Airport (National) and Dulles International Airport (Dulles), the two major airports serving the Washington, D.C. metropolitan area. Despite the fact that advertising space was available, and that the appellant, an organization which proposed the advertisement, was willing to pay the appropriate rental fee and to abide by the FAA's format requirements, the ad was rejected solely because it was political in nature and thus perceived to be inconsistent with the government's interests in maintaining a purely commercial and public service advertising medium. The appellant, claiming a violation of its first amendment rights, unsuccessfully sought declaratory and injunctive relief in district court. The court rejected the appellant's claim because, in its view, the setting of the proposed advertisement constituted a "nonforum" in which three governmental interests arguably justified the FAA's ban on political advertising. We hold that the district court misjudged the first amendment dimensions of the FAA's policy in this case. Accordingly, we reverse and remand for further proceedings.

## I. BACKGROUND

National and Dulles are federally owned airports, operated by the FAA. Most of the goods and services available to the public at these airports are provided by commercial concessionaires under contract to the FAA. Between October 1975 and October 1981, Transportation Displays, Inc. (TDI) held the exclusive contract for management of the commercial advertising programs at both airports. The contract required TDI to develop a master advertising plan for each airport, to install such advertising displays as wall units, dioramas, carousel displays, "island showcases," and courtesy phone counters, and to solicit and obtain advertising display business. Before TDI could place any advertisement, however, it had to obtain written approval of the ad's content and format from the FAA's Metropolitan Washington Airports (MWA) office. The FAA–TDI contract established the criteria on which government approval or disapproval was based:

All advertising shall be in good taste, professionally developed, and presented in such a manner as to be inoffensive to the general public and be of such a high caliber as to contribute to the establishment of the Airport's facilities as prestige locations for commercial advertising media.

FAA–TDI Contract No. DOT–FA–MWAS–5144, *reprinted in* Affidavit of George N. Terris (Attachment 1), Record Document (RD) 15. Although the contract does not, by its terms, prohibit political advertisements, it consistently has been applied by the MWA to prohibit ads "which would be considered political or issue-oriented in nature, rather than commercial or public service." Affidavit of George N. Terris, RD 15 at 3.

The appellant in this case is the United States Southwest Africa/Namibia Trade and Cultural Council (the Council), a nonprofit corporation organized under the laws of the District of Columbia and a registered foreign agent of the National Assembly and Council of Ministers of the territory of Southwest Africa/Namibia. Although neither the United States nor the world community recognizes the Council's principal as the legitimate governing body of Namibia, *see United States-Southwest Africa/Namibia Trade and Cultural Council v. United States Department of State,* 90 F.R.D. 695 (D.D.C.1981), *aff'd mem.,* No. 81–2018 (D.C. Cir. May 18, 1982), the FAA does not contest the district court's conclusion that, as a separate corporate entity of the District of Columbia, the Council enjoys standing to assert constitutional rights accruing to it as a legal person. *See* Memorandum Decision, RD 23 at 1 n. 1.

In September 1980, the Council employed The Agency, a Washington-based advertising firm, to prepare advertising copy for display at National and Dulles. The Agency contacted TDI and, after some preliminary negotiations, submitted an advertisement that was undeniably political. As the Council describes it:

> The proposed ad was entitled "SWAPO's RAPE of NAMIBIA" and listed four questions, as follows:
>
> Do you know—
> 1. SWAPO (South West Africa People's Organization) is a Soviet-Bloc Terrorist Group?
> 2. SWAPO is trying to take over Namibia by violence?
> 3. SWAPO is financed by the United Nations.
> 4. U.S. taxpayers finance the United Nations.

> The ad also contained five sketches, labelled "Namibian Girl," "Namibian game preserve at Etosha," "SWAPO Terrorism," "Military equipment supplied by Soviet-bloc," and "Uranium in Namibia."

Appellant's Brief at 5 n. 4. TDI forwarded the proposed ad to the MWA and, on November 5, 1980, the MWA returned it marked "Not approved—Not considered as material eligible to be displayed within scope of contract." RD 15, ¶ 13. On November 6, in a telephone conference with the Council's attorney, the Chief of the MWA's Financial Management Division expressed his opinion that the advertisement was "controversial" but assured the Council's attorney that the MWA's disapproval of the ad had been based on the ad's political, rather than its controversial, nature. Affidavit of George N. Terris, RD 15 at 5.

The Council initiated this action in federal district court in December 1980, seeking to enjoin the government's prohibition. On cross-motions for summary judgment, the court ruled for the government on the basis of two conclusions. First, the court held that airport display advertising areas do not constitute "public forums." Second, the court held that three governmental interests justified the FAA's ban on political advertisements: (1) it allows the government to maintain a higher level of long-term commercial revenue than could be obtained by opening the displays to less professional short-term political ads; (2) it avoids the appearance of government endorsement of the content of the political ads; and (3) it avoids administrative complexities in allocating a limited number of advertising spaces among political candidates or viewpoints. *See* Memorandum Decision, RD 23 at 4–9.

On appeal, the Council contends that the district court erred by allowing the FAA to promote its three objectives through unconstitutional means. Specifically, the Council argues that National and Dulles constitute public forums for communication at which

both first amendment and equal protection principles prohibit discrimination based solely on the subject matter of the Council's proposed advertisement. Such a content-based prohibition is unjustified, the Council adds, because the government can use less restrictive, content-neutral mechanisms to achieve its revenue interests and to ameliorate its other, non-revenue concerns.

## II. DISCUSSION

This case requires us to determine whether the federal government, as a property owner, has justified its ban on political advertising at National and Dulles Airports in light of its first amendment obligation, as a government, to "make no law ... abridging the freedom of speech." Preliminarily, we note that the complications inherent in the government's dual role as polity and property owner are compounded in this case by the FAA's use of a prohibition on advertising wholly based on the subject matter of the proposed messages. Subject matter restrictions on speech in public places have been treated by the Supreme Court as a peculiar type of content-based regulation. In places that can be categorized as "public forums" for communication—such as streets, parks, and similar common areas—the Court has generally struck down governmental discrimination among the "proper" subjects for expressive activity, although the Court has stated that such distinctions may be justified if shown to be truly necessary and finely tailored to serve "substantial" or "compelling" state interests. See, e.g., Carey v. Brown, 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) (striking down distinction between proper subjects of peaceful picketing on city streets); Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (same); Police Department of Chicago v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (same). In contrast, in places that are more aptly categorized as "nonforums"—such as prisons, military bases, and buses—the Court has sustained the use of subject matter restrictions provided that they are reasonably designed to limit expressive activities to uses compatible with

the public facilities' intended purposes and not imposed to suppress expression simply because public officials oppose the speaker's particular point of view. See, e.g., Jones v. North Carolina Prisoners' Union, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) (upholding prison ban on certain union activities among inmates); Greer v. Spock, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (upholding ban on partisan political speeches on military base); Lehman v. City of Shaker Heights, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (plurality opinion) (upholding ban on political advertising from "car cards" on city buses); cf. Perry Education Association v. Perry Local Educators' Association, —— U.S. ——, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (internal mailbox system of public school is a nonforum to which designated teachers' union, but not other unions, may have access). We discuss below the countervailing speech and non-speech interests surrounding the FAA's particular subject matter distinction between political and nonpolitical advertisements. It is appropriate to begin the analysis, however, by considering the nature of the place on which the FAA has imposed its prohibition of political ads.

### A. The Type of Public Property At Issue

The trial court below analyzed the display advertising areas at National and Dulles as separate "nonforums" within the airports' terminals, akin to the advertising spaces at issue in Lehman v. City of Shaker Heights, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974). Lehman upheld a governmental scheme by which the City of Shaker Heights leased "car cards" on municipal buses for commercial and public service, but not political, advertisements. Id. at 303, 94 S.Ct. at 2717. Reasoning that the factual pattern in the present case is similar to the factual pattern presented in Lehman, the district court concluded that the FAA should enjoy the same latitude to impose subject matter restrictions on advertising at the airports as the City of Shaker Heights enjoyed to impose limitations on advertising on its buses. Memorandum Decision, RD 23 at 6.

We think that the district court's analogy to *Lehman* is factually flawed and the situation at National and Dulles far more complex than the district court's easy "nonforum" classification reflects. In particular, the district court was wrong to consider the advertising display cases as discrete, self-contained forums—apart from the airport terminals in which they are located. Although we readily acknowledge the fact that the airports' advertising facilities are physically distinct parts of the terminals—access to which is limited to those willing to pay and to meet certain format requirements—we note that these facilities are for the most part physically "separated" from the terminals only by glass panels or translucent plexiglass whose sole purpose is to frame or project messages of outside organizations to the terminals' public users. Given the peculiar role of these facilities as the self-described premiere communications medium at National and Dulles, *see, e.g.,* TDI, *Airport Advertising—The Blue Chip Medium,* RD 15 (Attachment 4), any restrictions placed on the subject matter of airport advertisements are also placed on one of the dominant forms of speech—if not *the* dominant medium of "outside" communication—within the airport terminals themselves. Accordingly, to appraise accurately the public forum/nonforum nature of the public properties at issue in this case, we must evaluate the nature of the airport terminals of which the display advertisement areas are an organic part. Our consideration of the airport terminals in this case parallels the Supreme Court's consideration of the functions and physical limitations of the buses at issue in *Lehman.* 318 U.S. at 306, 94 S.Ct. at 2718 (Douglas, J., concurring) ("[b]ut a streetcar or bus is plainly not a park or sidewalk or other meeting place for discussion . . . ."); *see infra* at 766–767 (discussing *Lehman*); *cf. Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (public area of military base properly regarded as a nonforum in light of the larger historical and symbolic context of the military base as a whole).

1. The Context of the Display Advertising Facilities at National and Dulles

The Council seeks to place its advertisements in those open areas of National and Dulles Airports that contain many of the facilities and services of a fair-sized municipality. Roughly eighteen million people pass through the concourses and walkways of these two airports each year, enjoying the benefits of restaurants and snack bars, two post offices, various specialty shops, two medical stations, at least five bars, a barber shop, drug stores, banks, newsstands, and police stations. *See generally* Affidavit of George N. Terris (Attachment 3), RD 15; *Fiscal Year 1982 Appropriations: Hearings Before the Subcomm. on Aviation of the House Comm. on Public Works and Transportation, Part 2,* 97th Cong., 1st Sess. 158 (Dept. of Transportation submission). Although not every *form* of speech is necessarily consistent with the airports' primary use, it seems clear that the public places in these airports are far more akin to such public forums as streets and common areas than they are to such nonforums as prisons, buses, and military bases.

Although this court has not heretofore had occasion to analyze the public areas at National and Dulles for first amendment purposes, our categorization of those areas as "public forums" is supported by the similar conclusions of other courts. In *Chicago Area Military Project v. City of Chicago,* 508 F.2d 921 (7th Cir.), *cert. denied,* 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 483 (1975), for example, the Seventh Circuit held that "the spacious, city-owned common areas [of Chicago's O'Hare Airport] . . . resemble those public thoroughfares which have been long recognized to be particularly appropriate places for the exercise of constitutionally protected rights to communicate ideas and information," *id.* at 925; *accord Kuszyski v. City of Oakland,* 479 F.2d 1130, 1131 (9th Cir.1973) (Oakland Airport); *Fernandes v. Limmer,* 465 F.Supp. 493 (N.D.Tex.1979), *aff'd,* 663 F.2d 619 (5th Cir. 1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 5, 73 L.Ed.2d 1395 (1982) (Dallas/Fort Worth Regional Airport); *International Society for Krishna Consciousness v. Wolke,*

453 F.Supp. 869 (E.D.Wis.1978) (General Mitchell Field, Milwaukee); *International Society for Krishna Consciousness of Western Pennsylvania, Inc. v. Griffin,* 437 F.Supp. 666 (W.D.Pa.1977) (Greater Pittsburgh International Airport); *International Society for Krishna Consciousness v. Rochford,* 425 F.Supp. 734 (N.D.Ill.1977), *aff'd in part, rev'd in part,* 585 F.2d 263 (7th Cir. 1978) (O'Hare Airport); *International Society for Krishna Consciousness v. Engelhardt,* 425 F.Supp. 176 (W.D.Mo.1977) (Kansas City International Airport).

That these judicial conclusions should apply with equal force to National and Dulles is evidenced by the fact that, as part of the Aviation Safety and Noise Abatement Act of 1979, Congress ordered the FAA to promulgate rules regulating access to public areas at National and Dulles for individuals and organizations desiring to solicit funds or distribute written material. 49 U.S.C. § 1359 (Supp. V 1981). During the subsequent administrative rulemaking, the FAA specifically observed that at these two airports

> [t]here is a considerable amount of social and commercial interchange in the terminals and, in many respects, the terminals are like any other public thoroughfare where there is no question that the constitutional guarantees of freedom of speech, the exercise of religion and the right to peaceable assembly apply. These activities enjoy the protection of the First Amendment, and they may not be regulated by airport authorities in the same manner as commercial activity.

45 Fed.Reg. 35,314 (1980). We note that, pursuant to the FAA's solicitation and leafletting rules, 14 C.F.R. §§ 159.91–.94 (1982), nonprofit organizations such as the Council are among those allowed to apply for leafletting and/or solicitation permits.

Given the considerable caselaw regarding airports in general and the specific congressional and administrative judgments regarding first amendment access to National and Dulles in particular, it is not surprising that the court below acknowledged the importance of the terminals as public forums.

Memorandum Decision, RD 23 at 4–6. Yet, as discussed above, the trial court tossed aside all consideration of the larger forum and focused exclusively on the airports' display advertising areas as the only relevant "forum" at issue:

> [T]he plaintiff does not seek to set up a booth, solicit donations, distribute leaflets, or proselytize in face-to-face encounters. . . .
>
> . . . .
>
> Rather, the forum in which plaintiff seeks to assert its political views is the display advertising areas reserved for commercial use under the TDI–FAA contract. . . . In structure, purpose, and operation, the commercial advertising displays thus constitute a separate forum for expression from the remainder of the terminal. The advertising display facilities are the particular method of communication at issue in this case.

Memorandum Decision, RD 23 at 4–5. To the extent the district court meant to focus particular attention on the governmental interests at stake in the integrity of the FAA–TDI advertising medium, the court's point is well taken. An appropriate assessment and weighing of the government's unique, nonspeech interests in the display advertising areas is obviously important. And the district court would make another fair point if it meant to underscore the fact that Congress' mandate to provide first amendment access to National and Dulles, like the public forum caselaw regarding other airports, arose in the context of leafletting and soliciting and not in the context of display advertising. But the trial court was wrong to hold that the Council's challenge to the FAA's advertising policy realistically could be analyzed in isolation, removed from the fact that the advertisements are placed in terminals that the FAA has itself deemed "public thoroughfares where there is no question that the constitutional guarantees of freedom of speech . . . apply." 45 Fed.Reg. 35,314 (1980).

The trial court's artificially narrow focus in this case effectively writes out of the first amendment calculus the very consider-

ation of "place" that underlies the concept of the public forum. *See generally* Stone, *Fora Americana: Speech in Public Places,* 1974 SUP.CT.REV. 233; Kalven, *The Concept of the Public Forum: Cox v. Louisiana,* 1965 SUP.CT.REV. 1. We are not presented here with a situation where public forum status is claimed for a public facility simply because of that facility's "nearness" to a recognized public forum. *Cf. United States v. Grace,* —— U.S. ——, ——, 103 S.Ct. 1702, 1709, 75 L.Ed.2d 736 (1983) (traditional public forum property will not lose its character merely because it abuts nonforums). Rather, we are asked to evaluate a governmental restriction on speech within a facility that is designed solely to operate as an organ of communication within a larger facility. Given this context, the display advertising areas at National and Dulles cannot be wholly divorced—by structure, function, or fiat—from the nature of the public place in which they occur. The poster graphics and backlighted dioramas on the airport walls, and the freestanding "island showcases" and carousels in the midst of the airport concourses, are described in FAA literature as an "integral part" of the terminal environment. *See* FAA, *A Study of Airports—Design, Art & Architecture* 4 (1981), RD at Defendant's Exhibit 1. TDI's promotional literature repeatedly emphasizes that the design of airport terminals and the attendant concentration of people are part of the advertising "medium" that it offers for sale. *See* TDI, *Airport Advertising—The Blue Chip Medium,* RD 15 (Attachment 4). One need not be a Marshall McLuhan to realize that the 200-plus advertising displays at National and Dulles have a significant effect on setting the subjects for discussion, introspection, or inquiry (or lack thereof) in concourses and walkways that the FAA has characterized "in many respects . . . like any other public thoroughfare" for first amendment purposes. 45 Fed.Reg. 35,314 (1980). Whatever common-sense differences may exist in the forms of free speech allowable in airports, as opposed to parks and streets, an unusual consensus of judicial, legislative, and administrative opinion would classify the public areas of

National and Dulles squarely within the public forum family. The district court's one-sided focus on the advertising display cases, without regard to the larger forum of which they are physically and functionally a part, distorts the first amendment realities of this particular medium of communication at these particular public places.

### 2. *Lehman v. City of Shaker Heights*

This point is reinforced by the Supreme Court's opinion in *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974). As mentioned above, *Lehman* involved the exclusion of political advertising from "car cards" on city-owned buses that were otherwise open to commercial and public service messages. Although the Court's 5–4 decision upheld the exclusion, Justice Blackmun's plurality opinion and Justice Douglas' concurring opinion contain the bases for two important points of distinction between the on-board advertising space at issue in *Lehman* and the advertising space in transportation terminals such as those at National and Dulles.

First, the majority found that the government's ability to exclude political ads from buses was permissible, in part, because the exclusion did not affect the type of wide-open public forum where the free flow of information is especially vital. For example, in describing the buses at issue in *Lehman,* the plurality observed: "Here, we have no open spaces, no meeting hall, park, street corner, or other thoroughfare." *Id.* at 303, 94 S.Ct. at 2717. And Justice Douglas explicitly noted in his concurrence:

*If the streetcar or bus were a forum for communication akin to that of streets or public parks, considerable problems would be presented.* "The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interests of all . . . but it must not, in the guise of regulation, be abridged or denied."

*Id.* at 305, 94 S.Ct. at 2718 (quoting *Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939) (emphasis added). Ac-

cess to the advertising spaces in the public areas at National and Dulles thus presents precisely the type of situation left open by the *Lehman* Court.

A second, related distinction lies in the difference in intrusiveness between a political advertisement on a city bus and a similar ad placed in the more expansive, open areas of an airport terminal. For the *Lehman* plurality, the crowded confines of buses were inappropriate forums for political advertisements in part because they presented "the risk of imposing upon a captive audience." 418 U.S. at 304, 94 S.Ct. at 2717. For Justice Douglas, the point was dispositive: "In my view the right of the commuters to be free from forced intrusions on their privacy precludes the city from transforming its vehicles of public transportation into forums for the dissemination of ideas upon this captive audience." *Id.* at 307, 94 S.Ct. at 2719. The captive audience concerns of the *Lehman* Court, however, are obviously lessened in the open parts of airport terminals that the FAA likens to "public thoroughfares." Indeed, one year later in *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975), the Court interpreted *Lehman* as recognizing "that the degree of captivity and the resultant intrusion on privacy is significantly greater for a passenger on a bus than for a person on the street." *Id.* at 209–10 n. 5, 95 S.Ct. at 2272–2273 n. 5. A person in the airports' concourses or walkways who considers an advertisement—commercial or noncommercial—to be objectionable enjoys the freedom simply to walk away that a passenger on a bus does not.

By focusing only on the similarity in advertising schemes involved in the present case and in *Lehman,* the district court overlooked the wholly different types of public places in which these governmental schemes operate. Yet, as *Lehman* itself demonstrates, a government prohibition of political advertisements cannot be analyzed in isolation—the *Lehman* Court specifically tied its analysis to a consideration of the place from which the advertisements were to be banned. Unlike the buses at issue in *Lehman,* therefore, the government's ban on political advertising at the airport terminals at National and Dulles must be analyzed in light of the public forums in which it operates.

### 3. The Proprietary Dimension of the FAA–TDI Display Advertising Areas

The distinctions we have drawn with *Lehman v. City of Shaker Heights* are not meant to obscure the similarities that exist between the governmental interest in making money from display advertising on buses and in making money from display advertising at airport terminals. Rather, the distinctions are important because they highlight the different first amendment considerations that come into play when the government seeks to capitalize on property with public forum characteristics. In this hybrid situation, unlike the wholly commercial nonforum at issue in *Lehman,* the mere fact that a collateral commercial venture is involved cannot obscure the first amendment interests at stake. *See Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 549 n. 4, 555, 95 S.Ct. 1239, 1241 n. 4, 1242, 43 L.Ed.2d 448 (1975) (municipal theatre recognized as a public forum even though the theatre was managed as a nonprofit commercial venture); *cf. Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) ("state action" found for purposes of equal protection analysis under the fourteenth amendment, even though State of Delaware involved in a commercial venture). *See generally* Karst, *Public Enterprise and the Public Forum: A Comment on* Southeastern Promotions, Ltd. v. Conrad, 37 Ohio St. L.J. 247 (1976). The government's ban on political advertisements at the airports, therefore, must be judged by a standard that reflects both the government's proprietary interests in its advertising medium as well as the first amendment interests in the public forum of which the advertisements are a part.

In choosing the proper standard, we are mindful of the emphasis placed by the Supreme Court on the character of the gov-

ernmental restriction in issue. As mentioned above, subject matter restrictions on speech in public forums traditionally have been invalidated, although the Court has stated that such restrictions may be justified if shown to be truly necessary and finely tailored to serve "substantial" or "compelling" state interests. *See* cases cited *supra* p. 763. On the other hand, the Court repeatedly has sanctioned the use of reasonable, content-neutral time, place, and manner regulations in public forums if the regulations are narrowly tailored to serve a "significant" government interest and if they leave open ample alternative channels of communication. *See, e.g., United States v. Grace,* —— U.S. at ——, 103 S.Ct. at 1707; *Heffron v. International Society for Krishna Consciousness,* 452 U.S. 640, 647, 654, 101 S.Ct. 2559, 2563, 2567, 69 L.Ed.2d 298 (1981). In the present case, the district court rejected the contention that the FAA's ban on political advertising could be analyzed as a content-neutral "place" or "manner" regulation: "Because the FAA's policy does not restrict all display advertising but restricts only political advertising, a time, place, and manner analysis is inapposite." Memorandum Decision, RD 23 at 4 n. 8. The government does not contest this conclusion on appeal, nor do we see any reason to reject the district court's appraisal. Applying a content-neutral time, place, and manner analysis to the FAA's ban on political advertising would seriously understate the distinct first amendment interests at stake when the government chooses the "proper" subjects for communication in a given medium. Accordingly, we must recognize the FAA's ban on political advertising for the subject matter restriction that it is.

This subject matter restriction is not necessarily impermissible, however. Given that the airport advertising areas exist solely to raise revenue, *see* Affidavit of George N. Terris, RD 15, it follows that the FAA's revenue interest may constitute a sufficiently "substantial" or "compelling" interest to justify the FAA's distinction between political and commercial advertisements if: (1) there exists a convincing factual basis for treating the FAA's ban on political ads as a financial necessity; and (2) the revenue-threatening aspects of political advertisements cannot be ameliorated by less restrictive means. With this standard in mind, we turn to an evaluation of the FAA's subject matter restriction and its asserted justifications.

B. *The FAA's Distinction Between Political and Commercial Advertisements*

1. The First Amendment Interests at Stake

In applying the proper legal standard to the status quo at National and Dulles, and to the district court's decision in this case, it is appropriate to begin by discussing the first amendment "costs" imposed on the airports' public areas by the FAA's ban on political advertisements. Specifically, by creating premiere message spaces at the airports, but then prohibiting their use for political advertisements, the FAA has affected first amendment values in public forums in three ways.

First, the FAA's subject matter restriction allows the government significant control over the type of ideas to which the public will be exposed at National and Dulles. Although subject matter restrictions may not present the same dangers as more specific, viewpoint-based prohibitions, their costs in first amendment terms should not be understated:

> The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic. . . . To allow the government the choice of permissible subjects for public debate would be to allow that government control over the search for political truth.

*Consolidated Edison Co. v. Public Service Commission,* 447 U.S. 530, 537–38, 100 S.Ct. 2326, 2333–2334, 65 L.Ed.2d 319 (1980) (striking down government prohibition on utility's discussing "controversial issues of public policy" in bill inserts). *See generally* Stone, *Restrictions of Speech Because of its*

Content: The Peculiar Case of Subject Matter Restrictions, 46 U.Chi.L.Rev. 81 (1978). In the present case, the government's ban on political advertisements implicates one of the central purposes of the first amendment: "uninhibited, robust, and wide open" debate on matters of public affairs. *New York Times v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964). The first amendment affords broad protection to such speech to assure individual interests in self-expression, *see, e.g., Police Department of Chicago v. Mosley*, 408 U.S. 92, 95–96, 92 S.Ct. 2286, 2289–2290, 33 L.Ed.2d 212 (1972), as well as "to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Buckley v. Valeo*, 424 U.S. 1, 14, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976) (per curiam) (quoting *Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957)). Of course, the fact that the prohibited messages are to be presented in the form of paid advertisements does not diminish the first amendment recognition to which they are entitled; editorial advertisements constitute "an important outlet for the promulgation of information and ideas by persons who do not themselves have access to publishing facilities. . . ." *New York Times v. Sullivan*, 376 U.S. at 265–66, 84 S.Ct. at 718–719.

The particular political-commercial distinction drawn by the FAA's advertising policy implicates a second, related concern—that the policy operates in part to screen out only controversial, but not non-controversial, political messages. Although the Supreme Court has noted the common-sense differences between speech that does "no more than propose a commercial transaction" and other speech, *Virginia Pharmacy Board v. Virginia Consumer Council*, 425 U.S. 748, 771 n. 24, 96 S.Ct. 1817, 1830 n. 24, 48 L.Ed.2d 346 (1976) (quoting *Pittsburgh Press Co. v. Human Relations Commission*, 413 U.S. 376, 384, 93 S.Ct. 2553, 2558, 37 L.Ed.2d 669 (1973)), the capacity of commercial speech to communicate simultaneously political and social messages can be discerned by anyone who gives second thought to a "public relations" advertisement by an industrial manufacturer of defense-related equipment or an advertisement for commercial abortion services available at a family planning clinic. *See, e.g., Bigelow v. Virginia*, 421 U.S. 809, 822, 95 S.Ct. 2222, 2232, 44 L.Ed.2d 600 (1975) (advertisement of available abortion services has "newsworthy" aspects). Indeed, the hazy line between ideological and commercial speech is reflected in the record of this case. Before expressing its doubts about the Council's "political" advertisement, TDI had expressed its preliminary approval of a travel-type poster of Namibia, which had been submitted earlier by the Council, as neither "political" nor "objectionable." *See* Affidavit of Barbara Settle, TDI Account Executive, RD 14 at 1. But when one recalls that the international controversy over Namibia largely revolves about questions of political sovereignty, a travel poster of Namibia on behalf of the government of Southwest Africa/Namibia would be no more politically "neutral" than a travel poster concerning the Falkland/Malvinas Islands by the government of Argentina or a travel poster concerning the island of Taiwan by the Peoples' Republic of China. Yet TDI felt that such a poster fell on the commercial, rather than political, side of the line. The point is not that the distinction between commercial and political speech is entirely unworkable—there is little doubt that it can operate successfully at the extremes to screen out patently political from wholly commercial advertisements. Rather, the point is that there is a gray area near the middle in which this particular subject matter restriction tends to operate as a *sub rosa* penalty on presenting political viewpoints in "controversial," as opposed to more benign "commercial," forms. *Cf. Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 540, 101 S.Ct. 2882, 2909, 69 L.Ed.2d 800 (1981) (Brennan, J., concurring) (line between ideological and nonideological speech is uncertain). As has been noted in another context, the use of the controversial nature of speech as the effective touchstone for regu-

lation "threatens a value at the very core of the First Amendment, the 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Consolidated Edison,* 447 U.S. at 548 n. 9, 100 S.Ct. at 2339 n. 9 (Stevens, J., concurring) (quoting *New York Times v. Sullivan,* 376 U.S. at 270, 84 S.Ct. at 721).

There is a third, and final, first amendment interest at stake in this case. Even viewing the FAA's subject matter distinction at the extremes, where it works best, the government's approval of paid commercial, but not political, advertisements reverses the normal preference in our jurisprudence for noncommercial speech. *See Virginia Pharmacy Board,* 425 U.S. at 770–73, 96 S.Ct. at 1829–31. Although noting that government-created forums may create special problems, a plurality of the Supreme Court recently invalidated a municipal limitation on outdoor display advertising because the municipal scheme accorded a greater degree of protection to commercial than to noncommercial advertisements; such a scheme, the plurality stated, "effectively inverts" the relative values of commercial and noncommercial speech. *See Metromedia,* 453 U.S. at 513 & n. 19, 101 S.Ct. at 2896 & n. 19 (plurality opinion).

In short, the nature of the Council's proposed advertisement and the character of the FAA's restriction on speech combine to implicate a variety of different first amendment values.

### 2. The Government's Revenue Interests

Of course, the first amendment interests implicated by the FAA's subject matter restriction must be measured against the government's countervailing interests—especially the government's interest in ensuring advertising revenue. Given the financial *raison d'etre* of the airports' display advertising areas, the district court concluded that "reservation of the display space for commercial use allows TDI to maintain a higher level of long-term commercial revenue than could be obtained by opening the displays to less professional short-term can-

didacy or issue oriented advertising." Memorandum Decision, RD 23 at 7. On its face, however, this conclusion encompasses two concerns that are either wholly conjectural or that can be served by far less restrictive means than the FAA's blanket proscription of political advertisements.

The court's concern with short-term advertising is seriously overstated. There is nothing in the record of this case to suggest that the three-month lease negotiated by the Council and TDI was of unusually short duration, *see* Advertising Cross Order, *reprinted in* Affidavit of George N. Terris (Attachment 5), RD 15, or that political advertisements in general would tend to run for shorter periods of time than commercial ads. But to the extent TDI and the government wish to ensure a long-term advertising medium, they can more precisely serve this interest by requiring minimum time periods in their advertising leases, applicable to all, than by prohibiting only political ads—short-term and long-term—in particular.

Similarly, the trial court's concern with "less professional" advertising has nothing on its face to do with political advertising *per se.* In its brief, the government states that "it is easy to imagine those who in order to pay for the display rental might scrimp on the expense associated with a professional layout ...." Government Brief at 14. But this hypothetical concern applies to any organization, commercial or noncommercial, whose advertising budget may become strained. And, in either situation, TDI and the government already have the power to insist that all advertisements be professionally designed. *See* FAA–TDI Contract, *supra* p. 761. Thus, the government need not fear that "[t]he high quality, commercial nature of the displays could easily diminish if political expression *in any format* were permitted in order to avoid claims of First Amendment violations." Government Brief at 16 (emphasis added). Our opinion today does not affect the government's ability to require that all advertisements at National and Dulles be prepared by advertising professionals or to pre-

clude the government from establishing standards for such things as the size, color, or lighting of advertising displays.

Given the content-neutral time and format requirements that the government may impose, there is virtually nothing in the record before us which adequately demonstrates that a broad scale ban on political advertisements is necessary to protect government revenue. At most, the record reveals the suspicion of one TDI official that "[t]he placement of controversial political advertising in TDI displays at National and Dulles Airports could hurt TDI's image as a professional advertising firm and discourage commercial advertisers from using the airport displays. This in turn could reduce revenue to TDI and to the FAA under the FAA–TDI contract." Affidavit of Jon Boisclair, TDI Regional Manager, RD 13, ¶ 9. This single, conclusory statement, however, hardly provides a compelling factual basis on which to justify a wholesale prohibition of political speech. *Cf. Solicitation and Leafletting Procedures at National and Dulles International Airports,* 45 Fed.Reg. 35,316 (1980) (discussing comprehensive traffic flow study used to develop factual basis for content-neutral soliciting and leafletting rules). For example, the statement provides no indication that the number of "discouraged" commercial advertisers is likely to be significant. Indeed, the record contains at least two indications why such an adverse reaction is unlikely. First, there has been no significant commercial reaction to other forms of political speech; commercial display areas in the airports' central concourses and lobbies continue to be considered the most desirable locations by commercial advertisers despite the fact that they are located in precisely those areas where political leafletting and solicitation are most common, *cf.* 14 C.F.R. § 159.93(g) (1982) (describing areas open to leafletting and solicitation); Affidavit of Jon Boisclair, RD 13, ¶ 11 (large dioramas, as opposed to wall displays, are always leased). Second, the market forces underlying airport advertising will continue whether political advertising is allowed or not; airport advertising generally

will remain uniquely adapted to reaching the "business air traveler," *cf.* TDI, *Airport Advertising—The Blue Chip Medium, supra* ("TDI is the way to reach and communicate with the frequent air traveler."). Although we do not foreclose the possibility that the FAA may yet develop evidence to demonstrate that political advertising would significantly threaten the FAA–TDI revenue base, the point is not so self-evident that its mere assertion in an affidavit can sustain a summary judgment for the government. As the Supreme Court has warned, an "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Tinker v. Des Moines School District,* 393 U.S. 503, 508, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969). We thus leave the door open for more concrete evidence that political advertising at the airports would be basically incompatible with the government's revenue objectives. *Cf. Grayned v. City of Rockford,* 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972) ("[t]he crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time."). As it stands now, however, the only "hard" evidence of record in this case is the loss—in the name of revenue production—of over $7,500 in advertising revenue from the rejection of the Council's proposed advertisement. *See* TDI Advertising Contracts, *reprinted in* Affidavit of Barbara Settle (Attachments 1 & 3), RD 13. The commercial interests of the government are hardly furthered by rejecting revenues.

3. The Government's Non-Revenue Interests

The district court also upheld the FAA's ban on political advertisements because "the presence of political advertising in the government owned and controlled airports could create the appearance of government support for or endorsement of the message advertised." Memorandum Decision, RD 23 at 8. This conclusion apparently stems from the belief of an FAA official that "[t]he mere appearance or suspicion that a

political advertisement in the airports indicated Government support *or even tolerance* of the message advertised could undermine Government functions and objectives, particularly with respect to foreign policy." Affidavit of George N. Terris, RD 15 at 4 (emphasis added). This disturbing argument, however, surely claims too much; carried to its logical conclusion, it would serve as a sweeping antithesis to first amendment rights in virtually every public place likely to be visited, or even seen, by any foreign dignitary. Such a position is not only inconsistent with the our first amendment jurisprudence, it is also inconsistent with the formal position taken by the FAA in its rulemaking on airport solicitation and leafletting: "FAA has no interest in regulating the ideas disseminated at the airport, and has no intention of regulating based on the content of the message or the cause that a solicitor supports." 45 Fed.Reg. at 35,315. To the extent that the FAA wishes to ensure that political advertisements are not misconstrued as official pronouncements of government policy, it can serve this end by the far less restrictive alternative of printing disclaimers—perhaps at the bottom of the advertisement—in much the same way that it now displays printed disclaimers regarding the political views espoused by leafletters and solicitors.

Finally, the district court found that political advertisements were properly prohibited at National and Dulles to avoid "the sticky administrative problems of allocating a limited number of advertising spaces among political candidates or viewpoints" and to avoid the inefficiency that would result from "extensive FAA involvement in the selection and approval of ads." Memorandum Decision, RD 23 at 8. We disagree. The FAA itself has already determined that government "involvement" in display advertising is worth whatever inefficiency it entails—its avoidance, therefore, hardly constitutes a compelling end in itself. *See* Affidavit of George N. Terris, RD 15 at 3 ("In accordance with the terms of the FAA–TDI contract, TDI submits to my office, for approval, an 'Advertising Cross Order' for each ad proposed for display in the National Airport terminal. An ad is not placed until my office has approved the proposed contract in writing."). To the extent the government wishes to avoid the danger of favoritism in its allocation decisions, it easily can implement a first-come, first-served policy for the 200-plus airport display cases similar to that currently used by the FAA in allocating its handful of solicitation and leafletting permits. *See* 14 C.F.R. § 159.93(e) (1982) ("Permits will be granted on a first come, first served basis.").

Nor are we persuaded, as was the district court, that a flat ban on political advertisements may be justified to avoid administrative problems that may arise in implementing the FAA's "good taste" and "professionally developed" requirements. The district court apparently based its solicitude for this potential problem "in light of similar considerations" employed by the Supreme Court in *Columbia Broadcasting System v. Democratic National Committee,* 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973) (sustaining the prerogative of broadcast licensees to refuse editorial advertisements). *See* Memorandum Decision, RD 23 at 8–9. But the Supreme Court made it clear in *Columbia Broadcasting System* that its refusal to provide a private right of access to the broadcast media was justified because of the unique statutory obligations that Congress has imposed on broadcast licensees:

> Those decisions [prohibiting state-supported school newspapers from excluding editorial advertisements] provide little guidance, however, in resolving the question whether the First Amendment requires the Commission to mandate a private right of access to the broadcast media. *In none of those cases did the forum sought for expression have an affirmative and independent statutory obligation to provide full and fair coverage of public issues, such as Congress has imposed on all broadcast licensees.*

*Id.* at 129–30, 93 S.Ct. at 2099–2100 (plurality opinion) (emphasis added). As this passage from *Columbia Broadcasting System*

indicates, first amendment access to different forums will vary depending on the nature of each particular medium of expression; and the broadcast media, in particular, involves problems that are all but *sui generis* in first amendment jurisprudence. *See Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 386–92, 89 S.Ct. 1794, 1802–1808, 23 L.Ed.2d 371 (1969). The district court therefore erred in uncritically importing the unique policy considerations underlying access to the broadcast media to display advertising at the airports. The FAA has not been charged by Congress with the duty to provide full and fair coverage of public issues at National and Dulles, and indeed has disclaimed any independent interest in "regulating the ideas disseminated at the airport." *See* 45 Fed.Reg. at 35,315 (solicitation and leafletting rulemaking). Thus, first amendment constraints on the FAA's editorial "freedom" present very different conceptual problems than do similar constraints on broadcast licensees. Although it is possible that other difficulties could attend the FAA's application of a "good taste" requirement, we note that such difficulties are not unique to the FAA's regulation of display advertising, *see* 49 U.S.C. § 1359 (Supp. V 1981) (administrator has power to prohibit leafletters or solicitors from engaging in "obscene" remarks), and, in any event, are not before us in this case. The FAA has never suggested that the Council's advertisement lacked "good taste" or was not "professionally developed." We leave for future adjudication the FAA's ability to censor advertisements—either commercial or noncommercial—because they fail to meet the government's "good taste" standards.

In sum, our opinion today does not foreclose the FAA from implementing content-neutral time, place, and manner regulations narrowly drawn to serve the government's significant interests. The FAA's present ban on political advertising, however, is not such a time, place, or manner regulation. Thus, the FAA's advertising policy cannot be analogized to the type of content-neutral regulation upheld in *Heffron v. International Society for Krishna Consciousness,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981). In *Heffron,* the Court sustained a prohibition on the sale or distribution of merchandise on state fairgrounds except from duly licensed "booths," available on a first-come, first-served basis. Unlike this wholly content-neutral rule, which merely required that one type of activity be conducted from a designated location, the governmental scheme in place at the airports completely forecloses a medium of communication because of the subject matter sought to be expressed. Lest we understate the distinct first amendment interests at stake in the FAA's present subject matter restriction, *see supra* pp. 768–770, we may not analyze the FAA's proscription of political advertisements as merely a content-neutral time, place, or manner regulation.

Nor does our opinion "open up" government-owned or-operated display cases to political advertisements at any place other than at National and Dulles. Even there, we hold neither that the government originally was required to have provided advertising space nor that the government, having decided to provide advertising space, is precluded from operating its commercial venture in such a way as to maximize revenue. Instead, we hold only that the airport advertising opportunities made available to the public by the government cannot be shut off to political advertisements unless such advertisements can be shown to be basically incompatible with the government's substantial or compelling, countervailing interests.

Our analysis of display advertising at these airports is based on a careful calculation of these countervailing interests, influenced largely by the unique public property in which the advertising facilities are located. Thus, this calculation could lead to entirely different results in such places as buses, *see Lehman v. City of Shaker Heights,* 418 U.S. at 304, 94 S.Ct. at 2717; in specialized government media not generally available for lease by the public, *see Perry Education Association,* —— U.S. ——, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)

(access to school mailbox system may be based on status of union as employees' exclusive bargaining representative); or in government media dedicated to official agency business. Our holding today is confined to a content-based exclusion, at a uniquely public place, which has not been shown to be either necessary or narrowly drawn to serve a compelling government interest.

### Conclusion

The first amendment is not an abstract proposition; our society's commitment to free speech must exist in fact as well as in principle. In fact, the open, public areas of National and Dulles Airports have become contemporary crossroads in which millions of people each year engage in a considerable amount of commercial, social, and political interchange. As the FAA itself recognizes, "in many respects, the terminals are like any other public thoroughfare where there is no question that the constitutional guarantee[ ] of freedom of speech ... appl[ies]." 45 Fed.Reg. at 35,314.

We are aware that our society's commitment to robust—even irritating—debate at such public forums will not be easy. There will always be those to whom the roles of National and Dulles as "the Gateways to the Nation's Capital" will outshine the functional significance of National and Dulles as public forums for communication. *See* Memorandum Decision, RD 23 at 8. There will also be those whose complacency or sense of architectural aesthetics will be jarred by a political advertisement in the airports' terminals. But the creation of such disquietude is the very purpose of the amendment placed first in our Bill of Rights. In the absence of demonstrably compelling, countervailing reasons, the government may not ban political advertisements from the display advertising areas at National and Dulles Airports. Many people pass through these airport terminals with the hopes of soon witnessing the workings of the national capital and the symbols of this nation's principles. It is only fitting that these people are presented with tangible proof that the first amendment is operative and not simply on display in a glass case at the National Archives.

*Reversed and remanded.*