**LOW INCOME PEOPLE TOGETHER, INC., Plaintiff,**

v.

**Henry E. MANNING, et al., Defendants.**

### Civ. A. No. C84–2863.

United States District Court,
N.D. Ohio, E.D.

Aug. 16, 1985.

Robert H. Bonthius, Jr., Harold L. Williams, Legal Aid Soc. of Cleveland, Cleveland, Ohio, Gail White, American Civil Liberties Union of Cleveland Foundation, Inc., Akron, Ohio, for plaintiff.

Robert C. Maynard, R. Dean Jollay, Jr., Frances Floriano Goins, Squire, Sanders & Dempsey, Cleveland, Ohio, for defendants.

ANN ALDRICH, District Judge.

A non-partisan political action group of low-income citizens brings this First Amendment challenge to a public hospital's refusal to permit it to register voters and distribute leaflets in the lobby of its out-patient clinic building and in waiting areas adjacent to the clinics. Following a preliminary injunction hearing, the parties conducted additional discovery, agreed that the injunctive hearing would be considered to be the trial on the merits,[1] and submitted post-hearing briefs. On consideration of the entire record, this Court makes the following findings of fact and conclusions of law, as required by Fed.R.Civ.P. 52(a), and enters judgment for the defendants.

## I. FINDINGS OF FACT

### A. *The Parties*

The Cleveland Metropolitan General/Highland View Hospital ("the Hospital") is a large public facility on the Near West Side of Cleveland. It is a unit of the Cuyahoga County Hospital System. The Hospital was organized pursuant to Ohio Rev. Code §§ 339.01–99 and is owned by Cuyahoga County ("the County"). The Board of

---

1. Fed.R.Civ.P. 65(a)(2) provides:

Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application....

Cuyahoga County Commissioners ("the Commissioners") provides a portion of the Hospital's operating revenue. A Board of Trustees operates the Hospital and is appointed by the Commissioners, the senior Probate Judge and the Senior Judge of the Court of Common Pleas for Cuyahoga County. The Hospital provides a wide range of health services, including preventive and primary services and care. Many of its patients are poor and low-income residents of the County.

Low Income People Together, Inc. ("LIPT") is a non-profit corporation organized pursuant to the Ohio Revised Code. LIPT is located in the West Side Community House in Cleveland, not far from the Hospital. Most of its 400 members are unemployed heads of households; they and their families receive various forms of public assistance.

The dispute between the Hospital and LIPT originates in the increasingly severe financial problems faced by the Hospital as its sources of revenue have become depleted. The Hospital is exploring the possibility of restructuring itself from a governmental entity to a non-profit corporation; as a corporation, the Hospital would contract with the County and continue to provide essentially the same services. LIPT contends that this process—known as "privatization"—would be detrimental to patients, employees, and County taxpayers.

B. *The Bell Greve Facility*

The Hospital occupies 27.5 acres and comprises a number of buildings of different ages and sizes. Out-patient clinics are located on six floors of the Bell Greve Building ("Bell Greve").[2]

The ground floor of Bell Greve contains the main entrance for the clinics and for the emergency department, which is located in the adjacent South Building. Inside the doors is a lobby ("the Bell Greve Lobby") measuring approximately sixty-four feet by thirty-nine feet. The Bell Greve Lobby was completed and first placed in use in the fall of 1983. One end of the lobby is occupied by approximately thirty-five seats, which are used by relatives and friends of Bell Greve patients and patients undergoing surgery in the adjoining South Building. A Hospital employee with a telephone sits at a desk in that portion of the lobby and provides information about operations. At the other end of the lobby is a corridor leading to the South Building, a vending area, and an automatic, computerized banking machine operated by the AmeriTrust Company ("AmeriTrust").

Just beyond the lobby is the central registration area for all the Bell Greve out-patient clinics. A reception area and triage area are nearby. Directly across a ten-foot wide corridor from the registration area is the Family Practice Clinic and a waiting area. Further down the corridor are the Women, Infants and Children ("WIC") Clinic, the out-patient laboratory and pharmacy, a Patient Accounts office, the Orthopedic/Spinal Cord Injury Clinic, Multi Service Clinics, and diagnostic facilities. Each clinic, office, or facility has an adjacent waiting area.

On the same corridor there are elevators leading to clinics on other floors of Bell Greve. The first floor houses the Department of Surgery, the Surgery Clinic, Oral Surgery Clinic, Oncology Clinic, and other medical and administrative facilities. The Obstetrics/Gynecology Clinics occupy much of the second floor, the Medicine Clinics are on the third floor, and the Pediatric Clinics are on the fifth floor. Each clinic has an adjacent waiting area. Other portions of the building are not relevant to this action.

The out-patient clinics provide an increasingly large proportion of the Hospital's medical care, primarily because federal and state policy changes have required hospitals to reduce the length of the in-patient stays of ambulatory patients. In the first eleven months of 1984, the Hospital treated outpatients in more than 243,812 visits to the clinics.

---

**2.** On September 28, 1984, prior to the hearing in this case, this Court and counsel for the parties toured the pertinent portions of the Bell Greve Building.

The Bell Greve Lobby is the focal point for all medical activity in the clinics; it is also the space through which ambulatory patients proceed on their way to the Emergency Room in the South Building. Patients coming to any of the clinics—and the relatives or friends accompanying them—enter the Bell Greve Lobby, register in the central registration area, and proceed to the waiting areas for the various clinics. Approximately 1,000 patients pass through the clinics and emergency room each day. A survey conducted for LIPT by an expert in architectural environment found that during busy mid-morning and early afternoon hours between thirty-one and forty-six people were either sitting or moving about the lobby.

The architect accurately concluded that, in terms of architectural design, the lobby resembles an airport more than an emergency room. Nonetheless, doctors frequently utilize the lobby in connection with their medical duties. Surgeons often come directly from the operating rooms in the South Building to that portion of the lobby used by their patients' visitors; there the doctors seek to find a quiet corner to discuss the outcome of the operation. Hospital physicians also testified that in certain circumstances it might prove necessary to administer emergency care to incoming patients as soon as they enter the lobby.

When out-patients and their companions arrive at the Bell Greve Lobby, they register and then proceed through the corridors and, if necessary, elevators or stairways, to the clinic or clinics that provide the patients with medical care. There they remain in a waiting room adjacent to the clinic until a physician can see the patient. Hospital officials and physicians readily concede that even though patients have appointments for a specific time they must often endure long waits. Some of the waiting areas are very crowded; in the General Medicine clinics, for example, as many as fifty to one hundred patients are seen during a morning or afternoon session.

By definition, the patients at the clinics are ill—often seriously and sometimes terminally ill—and both they and their companions are under considerable stress. Even patients whose malaises are not life-threatening are under a great deal of stress. Examples cited by the Hospital include teenagers who visit the Pediatrics Clinic with respect to pregnancy, sexually transmitted diseases, sexual abuse, and drug and alcohol problems, or older patients visiting the Obstetrics/Gynecology Clinics concerning similar matters. The physicians emphatically state that a quiet and peaceful atmosphere is medically required to relieve stress on these individuals and to protect their safety, privacy, and dignity. They also note that individuals in the waiting areas are essentially a "captive audience," confined there not only by their impending appointments but in some cases also by disabilities that restrict them to stretchers, wheelchairs, or crutches. Furthermore, the doctors unanimously emphasize that the environment in the waiting areas should be identical to that in their private offices—where they see patients and families, teach, and perform administrative and office work—and contend that disruptions in either area are equally detrimental to patients. As with the main lobby, the clinic waiting areas are sometimes the site of medical discussions or even treatment. On one occasion during the past year, a patient in the waiting area of the Cardiology Clinic suffered a cardiac arrest and received cardiopulmonary resuscitation treatment.

The Hospital's position with respect to the need for patient privacy and insulation is not universally shared. LIPT's expert medical witness, Dr. Quentin Young, stated that while he was chairman of the Department of Medicine at Cook County Hospital in Chicago, outside groups were permitted to distribute leaflets and discuss health issues in the clinic waiting areas. He asserted that no health care *per se* is delivered in the waiting rooms and suggested that patients' participation in health-related public policy issues is "health-enhancing". Dr. Young testified that he would respect, but respectfully disagree with, a different judg-

ment reached by other physicians—such as those at the Hospital.

C. *The Solicitation Policy*

Having weighed the costs and benefits and concluded that leafletting and proselytizing in the main lobby and clinic waiting areas does its patients more harm than good, the Hospital maintains a strict antisolicitation policy ("the Solicitation Policy"). As set forth most recently on March 26, 1984, the Solicitation Policy states:

I. POLICY

Solicitation on Hospital premises is prohibited except as specifically authorized under the terms of this policy.

II. SCOPE

This policy applies to all units of the Cuyahoga County Hospital System.

III. DEFINITION

Solicitation, for purposes of this policy, is defined as selling merchandise or services, collecting funds, or distributing literature of any kind that is not part of the day-to-day business of the Hospital.

IV. PURPOSE

This policy is adopted to prohibit unauthorized solicitations on Hospital property which are not in the best interest of the hospital and its patients.

V. RULES

A. *Authorized Solicitations:* When it is determined by the office of the Senior Vice President of Operations that a request to solicit is beneficial to the Hospital's employees, its patients, the community, or public relations, a solicitation may be authorized. Examples: United Appeal and Auxiliary Membership Drive. Solicitation of funds for a social occasion such as a marriage, birth of a child, or retirement are permitted within a department with the advance approval of the Department Head.

B. *Unauthorized Solicitations:* Any attempts to sell merchandise or services, distribute literature, or to collect funds from individual employees, visitors, or patients unrelated to the Hospital's interest and goals will not be authorized and as such are prohibited.

C. In no event will a solicitation be allowed in any area where patient care or services are provided; or where patients must pass or wait to obtain such care or services; or where patients may come to make requests and inquiries; or which are set aside for patient rest and recreation; or where patients may meet with their physicians or visitors; or in and through which emergency services must be able to move properly without interference.

D. In no event will a solicitation be allowed by an employee during his/her scheduled work time, or of an employee during his/her scheduled work time.

E. The posting of any written solicitation material in or on Hospital property, at anytime, is prohibited.

VI. PROCEDURE

Any person who wishes to request the privilege of soliciting on Hospital premises for other than a social occasion must submit an advance request in writing to the Senior Operating Officer of each unit of the Cuyahoga County Hospital System.[3]

\* \* \* \* \* \*

---

**3.** For purposes of comparison, the Hospital introduced into evidence the pertinent policy statement of the Cleveland Clinic Foundation, a local private hospital:

The Cleveland Clinic foundation's policy concerning solicitation and distribution of literature is as follows:

1) Employees—Solicitation of any nature or distribution of any literature by employees of the Foundation, with exception of that activity related to United Torch fund drives, are not permitted during an employee's working time ("working time" does not include lunch or break periods) or at any time in any patient care area, such as patients' rooms, operating rooms, x-ray rooms, or therapy areas.

2) Non-Employees—Solicitation by non-employees within the Cleveland Clinic Foundation's buildings or anywhere on its private property are prohibited. This rule will be enforced with all available legal remedies.

This solicitation policy is adopted to prevent inconvenience to our employees and visitors and to prevent interference with patient care.

In recent years, the Hospital has enforced its anti-solicitation policy by confiscating and disposing of a variety of political and religious literature, has ordered removed from its premises individuals distributing literature on behalf of palm readers, spiritualists, the Unification Church and Jehovah's Witnesses, along with a salesman of a socialist newspaper. Two leafletters of the Revolutionary Communist Party who refused to stop distributing literature were arrested. Martha Kutik, the Hospital's vice president for management services and author of the policy, testified that she had a one-and-one-half inch thick file of literature proposed for distribution, concerning topics ranging from car repair to school busing. In addition, several years prior to issuing the present Solicitation Policy the Hospital instructed several resident physicians not to wear buttons and insignia espousing personal positions on various social issues while they were on the Hospital premises.

The Hospital's restrictions have not left the facility entirely devoid of all literature, communications, and expressive activity, and not all activity in the Bell Greve lobby and outpatient clinic waiting areas has been strictly limited to patient care. The most prominent examples of such activity are summarized below. In no case, however, has the Hospital conducted or permitted expressive conduct of the sort sought by LIPT to take place during the hours when the clinics are open. The following activities were either substantially different from those proposed by LIPT or took place in other, and therefore irrelevant, areas of the Hospital.

1. *Bulletin Boards and Television*

Many of the clinics have bulletin boards containing posters, notices or leaflets concerning health education and other health-related matters. In the Pediatric Clinic, for example, notices are posted concerning remedies for choking and poisoning, along with information about children's car seats. Only notices concerning health issues are permitted. When commercial posters or leaflets are placed on the bulletin boards by salespersons, and when outside groups disperse literature dealing with political, moral and sociological issues not directly relating to health care or health education, Hospital employees remove such papers from the bulletin boards and discard them. Neither the Solicitation Policy nor any other Hospital document defines with precision the border between permissible and impermissible literature; the Hospital's view is essentially that its employees recognize improper solicitations, as defined by Part II of the Solicitation Policy, when they see them. However, the nature of the literature found on the bulletin boards was similar in the waiting areas of the different clinics that this Court observed.

In addition to the bulletin boards, the Hospital also facilitates patient education via a closed-circuit television channel, which provides a regular schedule of films about health.

2. *Gift Shop and Gift Cart*

Part V-A of the Solicitation Policy explicitly endorses the membership drive of the Auxiliary, a volunteer organization whose purpose is to raise funds for the Hospital and staff for projects which are approved by administrators. The Auxiliary provides almost all the funds for certain patient activities and recreation programs. It operates a gift shop for patients and visitors and a gift cart which circulates through the various waiting areas. Volunteers manning the cart distribute magazines and other reading materials contributed by Auxiliary members and other volunteers. The cart will not distribute leaflets or literature provided by outside groups. Determinations concerning the content of the cart's contents rest with the Auxiliary.

3. *Voter Registration*

The Hospital has also conducted voter registration campaigns for nearly a decade. In 1976 it conducted several days of registration as part of its efforts in support of a county levy for health and human services. In 1978, it offered long-term rehabilitation patients the opportunity to register to vote by absentee ballot. In 1980, off-duty employees and volunteers who were deputized

by the Board of Elections conducted a registration drive, at the Hospital cafeteria. Long-term patient and employee registration programs were repeated in 1982. The Bell Greve lobby was opened in 1983 and voter registration efforts were conducted there that year. Some materials were posted in the Hospital in opposition to two tax-reduction referenda that were on the Ohio ballot that year; however, no posters or other literature were posted in the Bell Greve lobby or outpatient clinic waiting areas.

In 1984, the Hospital expanded its efforts to include a registration table in the Bell Greve lobby, staffed at different times by approximately thirty off-duty employees and volunteers. At the time this lawsuit began, the Hospital planned to conduct registration between 11 a.m. and 1 p.m., Monday through Friday, from September 10, 1984 until the last day permitted by statute, October 9, 1984.

### 4. *AmeriTrust Bank-At-Work Station and Representative*

In addition to these educational or volunteer activities, the Hospital permits at least two commercial activities to be conducted on its grounds. One is the AmeriTrust Bank-At-Work station located just to the right of the main entrance to the Bell Greve lobby, next to the vending machine area. One day a week, an AmeriTrust employee sits at a table next to the automated teller machine to explain its functions, answer other questions, and sign up new accounts. The machine was installed to permit hospital employees to conduct their banking without leaving the Hospital; however, any individual AmeriTrust account-holder who possesses the necessary electronic card can use the machine. The AmeriTrust representative may only deal with employees and always checks for identification cards. With certain exceptions not relevant here, the representative must remain at the table, and cannot distribute literature or brochures to anyone except upon request. AmeriTrust has never opened accounts for anyone except Hospital employees, with the exception of an

employee of a vending machine company whose full-time job is to service Hospital vending machines. Finally, the Hospital refused AmeriTrust's request that it be permitted to place posters in other areas of the Hospital.

### 5. *Photographs of Newborns*

The other commercial activity involves an agreement between the Auxiliary and the Hospital Photo Guild of Lakewood, Ohio to provide mothers with a picture of their newborn children. A photographer takes a picture of every baby born at the Hospital. The mothers are then given one picture free of charge and the opportunity to purchase other copies; twenty-five percent of the sale proceeds is returned to the Auxiliary. It is not entirely clear from the record whether the photographer or an Auxiliary member approaches the mother to discuss the sale of the photos. Hospital administrators stressed that the photographs are a service, not a solicitation, and that presenting such photos is one of the most common and popular Auxiliary activities in hospitals across the country, serving to ease the patient's stay and create a pleasant, happy environment. In any event, neither the photographing nor the "service"/"solicitation" takes place in the lobby or the clinic waiting areas.

### 6. *Other Uses of Bell Greve Lobby*

The Hospital has also utilized the Bell Greve lobby for community events and private parties during hours when the clinics and lobby were closed to the public. On Saturday, October 22, 1983, the Hospital sponsored a "Community Day" celebration featuring health screening tests, general health information, voter registration, and children's fingerprinting identification. On October 20, 1984, also a Saturday, the lobby was used for a family festival for Hospital employees.

### D. *LIPT and the Hospital*

The Hospital had its first contact with LIPT in February of 1984. After the group requested information about the Hospital's services, a tour was organized of the facility, concentrating on the most-used out-patient services. During the first week

of May of 1984, LIPT members requested that the Hospital permit them to conduct voter registration in out-patient waiting areas. On May 8, 1984, the Hospital declined the request, citing both the existence of its own voter registration program and the crowded conditions in the Bell Greve Lobby and Emergency Room waiting area due to relocation and renovation.

In making its request to the Hospital, LIPT sought to extend a voter registration drive that it has conducted in welfare offices, food stamp centers, grocery stores, and during door-to-door canvassing. The policy of seeking out low-income potential voters in such places was adopted on the advice of nationwide groups such as Project VOTE! and Human Serve. LIPT members believe they must present health care issues to low-income voters at the Hospital because no alternative forums exist; they claim that their audience cannot afford, cannot read, or cannot understand newspapers and do not own television sets or do not watch news programs.

On May 11, LIPT members went to the Hospital with voter registration materials and leaflets for the purpose of registering voters and distributing leaflets in the Bell Greve Lobby. A Hospital official, accompanied by security guards, denied them entrance and informed them that they would not be permitted to conduct their planned activities in the Hospital. Attorneys for LIPT then wrote a letter to the Hospital, claiming that the group possessed a First Amendment right to canvass for unregistered voters and distribute leaflets in the out-patient waiting areas of the Hospital. The attorneys indicated that LIPT would commence a lawsuit if its demands were not satisfied. After a further exchange of correspondence, on August 3, 1984 LIPT hand-delivered to Hospital Vice President and General Counsel Ted F. Zawadski a "Statement of the Goals of L.I.P.T. for Registering Voters at Metro Hospital." As later amended, it states:

A. WHAT WE WANT

We want to have seven or eight of our members go Mondays through Fridays, during the hours of 8:30 A.M. to 1:30 P.M., from now until 10/9/84, to register to vote people waiting in sitting areas and on lines at the Out-Patient Lobby/Clinic Registration Area of the Bel [sic] Greve Building, and in the waiting areas of the emergency room and the various out-patient clinics, (including family practice, pediatrics, WIC, OB-GYN, eye, and ENT), as well as the pharmacy waiting room.

We intend to approach people who are waiting in these areas, and ask them if they are registered to vote. If they are not, we will ask if we can register them. We will use forms and information on the clip boards we will each carry. If they say "no," we will move on.

We also intend to discuss ballot-related issues affecting the delivery of health care in Cuyahoga County. We may also hand out leaflets.

In addition to using clip boards, we would like to set up a card table in the outer lobby of the Bel [sic] Greve Building during the same hours. One of our members will remain at the table to register voters, hand out leaflets, and discuss issues of potential concern to health-conscious poor people. The table will have signs telling its purpose forming an apron around it.

B. RESTRICTIONS WE AGREE TO.

1. Not to go into any area where medical care is routinely given.

2. To approach people one-on-one.

3. Not to badger anyone who expresses disinterest or disapproval in what we are doing.

4. Not to approach or continue to talk to anyone who appears to be in pain or acutely ill.

5. Not to block any area or interfere with the movement of people.

6. Not to make loud noise or cause disruption of the normal activity of the hospital.

7. Not to have more than 4 registrars in the Out-Patient Lobby/Clinic registration area at a given time; and not to

have more than 2 registrars in any one of the other areas at a given time.

8. Not to approach the person being served at the desk or the first and second people in line.

9. To pick up any of our leaflets that have been dropped on the floor or left laying about a waiting room.

On September 11, 1984, LIPT filed a verified complaint and a motion for temporary restraining order and subsequent preliminary injunction. The complaint seeks declaratory and injunctive relief under 42 U.S.C. § 1983, invoking jurisdiction under 28 U.S.C. §§ 1331, 1343(3), 2201 and 2202. The defendants are the Hospital and its President, Henry E. Manning. In its claim for relief LIPT asserts that "[t]he Hospital is a public forum and the activities in which L.I.P.T. members intend to engage are protected by the First Amendment." It seeks "a declaratory judgment that the First Amendment of the United States Constitution guarantees and protects the right of L.I.P.T. members to conduct non-partisan voter registration and to distribute leaflets concerning public health care issues in public out-patient waiting areas of the Hospital" and "preliminary and permanent injunctions prohibiting the Hospital and Mr. Manning from refusing to permit L.I.P.T. members to exercise their First Amendment rights by conducting voter registration and leafletting in the public out-patient waiting areas of the Hospital in a manner that does not interfere with the normal operation of the Hospital ..."

On the same day, this Court held a hearing at which the parties entered into an agreed restraining order, to remain in effect until a preliminary injunction hearing could be held. The agreement permitted two LIPT members to conduct voter registration at the Hospital's voter registration table in the lobby between 10:00 a.m. and noon, confined them to sitting or standing at the table, and allowed them to place a sign identifying LIPT on the table and to distribute organizational literature.[4] When the injunction hearing was rescheduled for September 28, 1984, this Court extended the temporary restraining order to that date. The defendants then moved for summary judgment. At the conclusion of the hearing, in light of undisputed testimony that the presence of LIPT members in the lobby under the terms of the temporary restraining order had not disrupted medical care in the Hospital, this Court extended the order until October 9, 1984, the last day of voter registration for the November elections. The portion of the order which permitted the distribution of organizational literature was vacated.

## II. CONCLUSIONS OF LAW

 The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech...." Political canvassing, soliciting, proselytizing and leafletting are expressive activities protected by the First Amendment. *Carey v. Brown*, 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980), *Gregory v. Chicago*, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969). This protection assures individual

---

**4.** The Order, as filed on September 12, 1984, provides in part:

Plaintiff's representatives shall have the right to be present in the Cleveland Metropolitan General Hospital ("CMGH") Bell Greve Lobby to conduct a voter registration program and to distribute organizational literature, subject to the following guidelines:

(1) Plaintiff's representatives shall conduct said activities beginning on Wednesday, September 12, 1984, and continuing through Tuesday, September 18, 1984, between the hours of 10:00 a.m. and 12:00 noon;

(2) Two members of plaintiff's organization shall be permitted to conduct the described activities at any given time;

(3) Plaintiff's representatives shall make use of the table, chairs and space employed by CMGH in its own voter registration program;

(4) Plaintiff's representatives shall be confined to sitting or standing at the table in conducting their activities;

(5) Plaintiff's representatives shall be permitted to place signs identifying their organization and their purpose on the table together with their organizational literature during the period referred to in paragraph (1) above; and

(6) CMGH retains the right to insure that the activities of plaintiff's representatives do not interfere with the purpose and function of CMGH.

interests in self-expression, *Police Department of Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), and permits free exchange of ideas and proposals for political and social change. *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). But the First Amendment does not prohibit appropriate governmental regulation of the time, place and manner in which these constitutional rights are exercised. *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984); *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981). "[T]he First Amendment does not guarantee access to government property simply because it is owned or controlled by the government." *United States Postal Service v. Council of Greenburgh Civic Associations*, 453 U.S. 114, 129, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981). More specifically, "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, —— U.S. ——, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985).

LIPT advances two alternative contentions: that the Bell Greve lobby and waiting areas are a "public forum" in which regulation of First Amendment activity is severely circumscribed; and, that even if the spaces are not regarded as a public forum, the Hospital's restrictions on its activity there are so unreasonable as to

violate the Constitution. The standard by which the Hospital's regulation must be measured depends upon an initial determination as to what sort of forum a public hospital is under the First Amendment.

As an initial matter, this Court accepts the Hospital's arguments that the Ohio law governing voter registration forbids the specific combination of voter registration plus lobbying and leafletting that LIPT's amended complaint demands.[5] Moreover, the record fails to demonstrate any inadequacy in the Hospital's current voter registration efforts—except in LIPT's view, that the registration has not been linked to dissemination of information about the privatization issue. Accordingly, what this dispute is really about is LIPT's demand to be permitted to discuss political issues and hand out political pamphlets in the Bell Greve lobby and out-patient clinic waiting areas.

A.

◼ Contentions that certain public property constitutes a "public forum" in which activities protected by the First Amendment must be given considerable leeway rest upon the line of cases commencing with *Hague v. CIO*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), and its holding that public streets and parks "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Id.* at 515, 59 S.Ct. at 964. Use of these traditionally public spaces "for communication of views on national questions may be regulated in the interest of all" but "it must not, in the

---

**5.** Ohio Rev.Code § 3599.38 provides:

No judge, clerk, witness, deputy sheriff, special deputy sheriff, police officer, or other election officer, while performing the duties of his office, shall wear any badge, sign, or other insignia or thing indicating his preference for any candidate or for any question submitted or influence or attempt to influence any voter to cast his ballot for or against any candidate or issue submitted at such election.

Whoever violates this section shall be fined not less than fifty nor more than one hundred

dollars and imprisoned not less than thirty days nor more than six months.

In its final pleading, LIPT has apparently abandoned its wholly unpersuasive argument that § 3599.38 is inapplicable to volunteer registrars. *Compare* Plaintiff's Reply to Defendants' Brief in Opposition to Plaintiff's Brief Upon Completion of the Record (no discussion of registration issue) *with* Defendants' Reply Brief to Plaintiff's Brief Upon Completion of the Record at 21–22.

guise of regulation, be abridged or denied." *Id.* at 516, 59 S.Ct. at 964.

In subsequent cases, the Court has wrestled with the conflict between the First Amendment and the government's proprietary interests in public property other than streets and parks. In *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), it divided state-owned territory and structures into three categories:

> In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed. At one end of the spectrum are streets and parks which "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." ... In these quintessential public forums, the government may not prohibit all communicative activity. For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.... The State may also enforce regulations of the time, place and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication....
>
> A second category consists of public property which the State has opened for use by the public as a place for expressive activity. The Constitution forbids a State to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place.... Although a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum. Reasonable time, place and manner regulations are permissible, and a content-based prohibition must be nar-

> rowly drawn to effectuate a compelling state interest....
>
> Public property which is not by tradition or designation a forum for public communication is governed by different standards. We have recognized that the "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." ... In addition to time, place, and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.... As we have stated on several occasions, "[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." ...

460 U.S. at 45–46, 103 S.Ct. at 954–955 (citations and footnotes omitted).

LIPT does not contend that the lobby and waiting areas constitute a traditional or customary forum, like a street or park. Instead, it offers two theories under which the locations should be deemed a "limited public forum" under the second prong of *Perry.* First, because the Hospital areas are places where people congregate, they are said to be a "natural forum" similar to other forums in which prohibitions on First Amendment activity recently have been overruled, including airports, commuter train stations, subway platforms, bus stations, and waiting areas in welfare and unemployment offices. Second, LIPT contends that by permitting Auxiliary activities and the AmeriTrust machine and representatives in the lobby, the Hospital has opened its grounds for use by the public as a place for expressive activity, a "designated forum." On examination, both positions prove to be without merit.

1.

LIPT regards the lobby and waiting areas as a natural forum because the spaces "are open to the general public seeking medical care, accompanying people seeking

medical care, waiting for people seeking medical care," and because they "are architecturally similar to an airport terminal," rendering them "a natural and appropriate site for the constitutionally protected exchange of ideas." [6] The argument relies heavily on the only federal appellate case finding public hospital grounds to be a public forum. *Dallas Association of Community Organizations for Reform Now v. Dallas County Hospital Dist.*, 670 F.2d 629 (5th Cir.1982) (*"Parkland II"*), *rev'g* 656 F.2d 1175 (5th Cir.) (*"Parkland I"*), *reh'g denied*, 680 F.2d 1391 (5th Cir.), *cert. denied*, 459 U.S. 1052, 103 S.Ct. 471, 74 L.Ed.2d 619 (1982). But since *Parkland II* is not controlling precedent in this circuit and is inconsistent with the Supreme Court's recent pronouncements on public forums, this Court declines to follow it.

Initially, a sweeping contention that any large, publicly-owned area where people gather should automatically be largely free from governmental regulation finds no support. In *United States v. Grace*, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983), decided two months after *Perry,* the Court stated:

Publicly owned or operated property does not become a "public forum" simply because members of the public are permitted to come and go at will.... Although whether the property has been "generally opened to the public" is a factor to consider in determining whether the government has opened its property to the use of the people for communicative purposes, it is not determinative of the question. We have regularly rejected the assertion that people who wish "to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please." ... There is little doubt that in some circumstances the Government may ban the entry on to public property that is not a "public forum" of all persons except those who have legitimate business on the premises. The Government, "no less than a private owner of property,

has the power to preserve the property under its control for the use to which it is lawfully dedicated." ...

461 U.S. at 177–178, 103 S.Ct. at 1707 (citations omitted).

Both *Perry* and *Grace* endorse the now lengthy line of cases in which the Court has upheld regulation of First Amendment activities in public spaces which are unsuited for unfettered expression: military bases, *Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), jails and prisons, *Adderley v. Florida*, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966); *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); advertising space in city rapid transit cars, *Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974); and the Postal Service's letterboxes. *United States Postal Service v. Council of Greenburgh*, 453 U.S. at 129, 101 S.Ct. at 2685. Summarizing these cases, *Grace* stated: "As *Greer v. Spock, supra,* teaches, the property is not transformed into 'public forum' property merely because the public is permitted to freely enter and leave the grounds at practically all times and the public is admitted to the building during specified hours." 461 U.S. at 178, 103 S.Ct. at 1707; *Perry,* 460 U.S. at 49 n. 9, 103 S.Ct. at 957 n. 9. Two recent decisions adhere to these principles. In *United States v. Albertini,* —— U.S. ——, 105 S.Ct. 2897, 2905, 86 L.Ed.2d 536 (1985), the Court wrote: "*Greer* expressly rejected the suggestion that 'whenever members of the public are permitted freely to visit a place owned or operated by the Government, then that place becomes a "public forum" for purposes of the First Amendment.' " And *Cornelius* repeated: "In cases where the principal function of the property would be disrupted by expressive activity, the Court is particularly reluctant to hold that the Government intended to designate a public forum." 105 S.Ct. at 3450 (citing *Lehman, Greer* and *Adderley* ).

---

**6.** Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment at 19.

Consequently, while *Grace* held that the public sidewalks forming the perimeter of the Supreme Court grounds were a public forum, *Perry* held that a public school's internal mail system was not a public forum. *Taxpayers for Vincent* upheld a Los Angeles ordinance prohibiting the posting of signs on public lampposts, in that "[appellees] fail to demonstrate the existence of a traditional right of access respecting such items as utility poles for purposes of the communication comparable to that recognized for public streets and parks ... Lampposts can of course be used as signposts, but the mere fact that government property can be used as a vehicle for communication does not mean that the Constitution requires such uses to be permitted." 104 S.Ct. at 2134. *Albertini* rejected a First Amendment challenge to a criminal conviction for unlawfully reentering a military base after having been barred by the commanding officer, noting that "the record does not suggest that the military so completely abandoned control that the base became indistinguishable from a public street ..." 105 S.Ct. at 2906. And *Cornelius* held that the Combined Federal Campaign ("CFC"), "an annual charitable fund-raising drive conducted in the federal workplace during working hours largely through the voluntary efforts of federal employees," was not created "for purposes of providing a forum for expressive activity" and was neither a natural nor a limited public forum. 105 S.Ct. at 3443, 3451.[7]

The *Cornelius* opinion relies extensively on *Lehman, see* 105 S.Ct. at 3451, 3452, 3453, and in its recent public forum cases the Court frequently has utilized the approach enunciated in Justice Blackmun's plurality opinion in *Lehman.* Upholding a ban on political advertising in transit cars, he emphasized that the mere fact than an instrumentality is used for the communication of ideas does not make a public forum, stating: "Were we to hold to the contrary,

display cases in *public hospitals,* libraries, office buildings, military compounds, and other public facilities immediately would become Hyde Parks open to every would-be pamphleteer and politician. This the Constitution does not require." 418 U.S. at 304, 94 S.Ct. at 2718 (emphasis added).

Of course, neither *Lehman* nor its progeny means that public property is precluded from being a limited public forum and a proper site for First Amendment activities merely because governmental activities other than speech and expression are performed there. "The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." *Grayned v. City of Rockford,* 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972); *Cornelius,* 105 S.Ct. at 3457 (Blackmun, J., dissenting). Phrasing this point more specifically, the Second Circuit stated:

> ... If, however, an area is not public forum, but is one used by the government to perform some non-speech related function, it may nevertheless be "appropriate" for the exercise of First Amendment activities if that exercise does not interfere with the primary activity for which it is intended, ... and if that exercise does not infringe the rights of a captive audience ...

*New York City Unemployed and Welfare Council v. Brezenoff,* 677 F.2d 232, 237 (2d Cir.1982) *("Brezenoff I")* (citations omitted), *after remand,* 742 F.2d 718 (2d Cir. 1984) *("Brezenoff II").* Thus, the court distinguished *Greer, Adderley* and *Jones* and found the waiting areas of a welfare center to be a limited public forum from which all discussion of welfare issues could not be banned. *Id.* at 238. Likewise, *Lehman* did not preclude another appellate court from finding National and Dulles Airports to be forums from which all political advertising could not permissibly be

7. *See also Chapman v. Thomas,* 743 F.2d 1056, 1059 n. 3 (4th Cir.1984) (residential areas of college dormitories not public forum) (citing prior unpublished decision), *cert. denied,* — U.S. —, 105 S.Ct. 1866, 85 L.Ed.2d 160 (1985);

*Pennsylvania Alliance for Jobs and Energy v. Council of the Borough of Munhall,* 743 F.2d 182, 186 (3d Cir.1984) (door-to-door canvassing not public forum).

banned. *U.S. Southwest Africa/Namibia Trade & Cultural Council v. United States,* 708 F.2d 760, 763–67 (D.C.Cir.1983) (and other airport cases cited therein), or bar a trial court from finding that commuter railroad stations are an appropriate forum for newspaper sales. *Gannett Satellite Information Network v. Metropolitan Transportation Authority,* 579 F.Supp. 90, 93–96 (S.D.N.Y.), *rev'd on other grounds,* 745 F.2d 767 (2d Cir.1984). *See also Eastern Connecticut Citizens Action Group v. Powers,* 723 F.2d 1050 (2d Cir. 1983) (upholding public access to state-owned railroad bed); *Wolin v. Port of New York Authority,* 392 F.2d 83 (2d Cir.1968); *Project VOTE! v. Ohio Bureau of Employment Services,* 578 F.Supp. 7, 10 (S.D. Ohio 1982) (unemployment offices).

Where do public hospitals fit into this body of public forum law? The Supreme Court has never directly addressed the issue. On the one hand, a footnote in *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 512 n. 6, 89 S.Ct. 733, 739 n. 6, 21 L.Ed.2d 731 (1969), compares public hospitals to jails, suggesting that *Adderley* and *Jones* may be relevant. And *Lehman,* as noted, stated in *dicta* that the Constitution does not require public hospitals to become "Hyde Parks". On the other hand, *NLRB v. Baptist Hospital, Inc.,* 442 U.S. 773, 99 S.Ct. 2598, 61 L.Ed.2d 251 (1979), and *Beth Israel Hospital v. NLRB,* 437 U.S. 483, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978), upheld the right of hospital employees to solicit and distribute literature to each other during non-working time in non-working areas of hospitals. In both of those cases, however, the majority and concurring opinions are filled with repeated expressions of concern for patient well-being. Furthermore, the cases involved not the First Amendment, but employee rights under the National Labor Relations Act, 29 U.S.C. §§ 151–68, and appear to leave room for considerable regulation of expressive activity in patient-care parts of hospitals. *See NLRB v. Harper-Grace Hospitals, Inc.,* 737 F.2d 576, 578 (6th Cir.1984) (prohibition on union activities during non-work time in non-work areas "is *presumptively invalid* under § 8(a)(1) [of the NLRA] unless the hospital can justify the prohibition as necessary to avoid disruption of health-care operations or disturbance of patients.")

In the absence of an applicable Supreme Court ruling, LIPT urges adherence to the approach utilized by the Fifth Circuit in the *Parkland* cases, which involved a constitutional challenge to a public hospital's "no solicitation" rule. The district court, after a bench trial, held that the hospital was not a public forum and that the ban on solicitation was constitutional. The court of appeals initially affirmed:

> ... There can be little question that a public hospital is, for First Amendment purposes, very different from municipal streets and parks which have traditionally served and previously been characterized as forums for free public assembly and communication of thoughts by private citizens....
>
> The Supreme Court has suggested that while performing public functions public hospitals are akin to jails and may impose reasonable time, place and manner restrictions on First Amendment activities. *See Tinker* ... Moreover, in *Lehman* ... the Supreme Court stated that the Constitution does not require that display cases in public hospitals become public forums open to every would-be pamphleteer and politician.... Following these intimations, other courts also have concluded that even peaceful speech and assembly interfering in any way with the functioning of a hospital may be excluded....

*Parkland I,* 656 F.2d at 1179–80. The court found *Baptist Hospital* and *Beth Israel Hospital* factually distinguishable because the overcrowding and congestion at Parkland "warrant the implementation of time, place, and manner restrictions on First Amendment activity in even the non-patient care areas of the Hospital and outpatient clinic areas which might in a different hospital not interfere with the functions of providing care to the sick and injured.... We merely wish to enable

those who need health care at Parkland to receive it without interference and without the grave possibilities of adverse medical reactions from such disturbing conditions." *Id.* The court therefore declined to consider the constitutional challenge to the hospital's no solicitation rule.

After a petition for rehearing *en banc* was filed, the panel reaffirmed its concern with "the necessity of preventing disruptive activity in the crowded front lobby of Parkland, the waiting room, the outpatient clinic, and the emergency treatment area, as well as any other area for patient treatment." *Parkland II*, 670 F.2d at 631. However, turning from the patient care areas to the remainder of the hospital grounds, the court determined that the hospital is a public forum, and voided the no-solicitation rule:

> The First Amendment is violated by unreasonable and unequal restrictions on access to public property, as well as by the delegation of authority to a single person to determine who may use public property for free speech....
>
> What may be forbidden is expression that interferes with the functioning of the hospital. An acceptable rule would prevent only those expressions that are basically incompatible with the normal activity of a particular place at a particular time....
>
> We hold that the rules at Parkland with regard to solicitation or leafletting must define by objective standards the literature that is forbidden because of the potential inference with the hospital's administration. Parkland need not allow disruption of the hospital or interference with patient care—by proper rules, with fixed standards, such disruption can be forbidden. The present rule, however, which contains no time, place and manner guidelines, and which is applied by the hospital administrator at his discretion, must be held unconstitutional.

*Id.* at 632 (citations and footnote omitted).

Judge Coleman dissented, stating in part:

> ... [I]n the absence of a Supreme Court decision to the contrary, I would hold

that a hospital—designed, constructed, and operated for the sole purpose of treating human ills—is not a public forum. The overriding function of such a unique institution should not be subjected to a room to room, place by place, analysis for the promulgation of some kind of a limited rule as to those particular areas. Overworked, understaffed personnel of hospitals should not have their mission diverted by such stumbling blocks. No real First Amendment right is promoted by allowing it. The privacy of and a reasonably tranquil atmosphere for sick people, and the efforts to help them if not always to cure them, ought not to be hampered by the necessity for specially tailored handling, which may survive the hair splitting analysis fostered by litigation. Let all propagandizers, of whatever purpose or ilk, stand clear of the last refuge of the sick.

*Id.* at 633–34.

The hospital's petition for a writ of certiorari was denied, but received votes from Justices Blackmun and Rehnquist. 459 U.S. at 1052, 103 S.Ct. at 471. The latter filed a dissent criticizing the Fifth Circuit's view that the hospital was a "public forum" and its holding invalidating the hospital's regulation. On the "public forum" issue, Justice Rehnquist stated:

> ... I think the Court of Appeals misunderstood the distinction in our cases between public property, such as city streets and parks, which has been historically treated as a "public forum," ... and public property, such as jails, military bases, and postal delivery boxes, which has been held not to be a public forum.... The decision of the Court of Appeals, mistakenly I believe, thus requires a hospital to promulgate a set of "regulations" which would provide for access to at least a part of its premises by such protest groups as respondents. To say that the decision severely limits the ability of public hospitals to devote their premises to the purpose of furnish-

ing medical care to the sick would be an understatement.

459 U.S. at 1052–53, 103 S.Ct. at 471.

■ While Justice Rehnquist's dissent is not Supreme Court precedent and Judge Coleman's dissent is not the law of the Fifth Circuit, there is much merit in the Hospital's contention that their views, and the views expressed in *Parkland I,* are much more consistent with *Perry, Grace, Taxpayers for Vincent, Albertini* and *Cornelius* than is the *Parkland II* opinion. Adhering to the admonition in *Perry,* 460 U.S. at 44, 103 S.Ct. at 954, and *Taxpayers for Vincent,* 104 S.Ct. at 2134, that the "existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending upon the character of the property at issue," this Court concludes that the Bell Greve Lobby and the outpatient clinic waiting areas are not public forums. Their sole purpose is to serve patients, friends and families of patients, and the Hospital staff who provide medical care. Since the Supreme Court has determined that jails, prisons, army bases, lampposts, school mail systems, letterboxes, and office fundraising campaigns are not public forums, it would be illogical to conclude that the Hospital's busy, sometimes crowded waiting areas, in close proximity to treatment and in frequent use for doctor-patient or doctor-family consultation, are an appropriate site for political activity. Accordingly, this Court declines to accept LIPT's contention that the lobby and waiting areas are a "natural forum."

2.

■ Nor can it reasonably be concluded that, by permitting a newstand, magazine cart, occasional open houses, and a courtesy banking service for employees within its walls, or by permitting its officials to discuss the privatization issue in other forums, the Hospital "has opened [its grounds] for use by the public as a place for expressive activity" under *Perry.* LIPT's repeated focus on the AmeriTrust machine and representative is particularly

inapposite. In *Lehman,* the court explicitly held that "the managerial decision to limit car card space to innocuous and less controversial commercial and service-oriented advertising does not rise to the dignity of a First Amendment violation." 418 U.S. at 304, 94 S.Ct. at 2718. In *Perry,* it stated:

... If by policy or by practice the Perry School District has opened its mail system for indiscriminate use by the general public, then PLEA could justifiably argue a public forum has been created. This, however, is not the case. As the case comes before us, there is no indication in the record that the school mailboxes and interschool delivery system are open for use by the general public. Permission to use the system to communicate with teachers must be secured from the individual building principal. There is no court finding or evidence in the record which demonstrates that this permission has been granted as a matter of course to all who seek to distribute material. We can only conclude that the schools do allow some outside organizations such as the YMCA, Cub Scouts, and other civic and church organizations to use the facilities. *This type of selective access does not transform government property into a public forum....*

Moreover, even if we assume that by granting access to the Cub Scouts, YMCAs, and parochial schools, the School District has created a "limited" public forum, the constitutional right of access would in any event extend only to other entities of similar character. While the school mail facilities thus might be a forum generally open for use by the Girl Scouts, the local boys' club and other organizations that engage in activities of interest and educational relevance to students, they would not as a consequence be open to an organization such as PLEA, which is concerned with the terms and conditions of teacher employment.

460 U.S. at 47–48, 103 S.Ct. at 956 (emphasis added). *Albertini* held that an air force base did not "become a public forum merely because the base was used to communi-

cate ideas or information during [an] open house," 105 S.Ct. at 2905, and, *Cornelius* reiterated that the mere fact that "expressive activity ... occurs in the context of the forum created does not imply that the forum thereby becomes a public forum for First Amendment purposes." 105 S.Ct. at 3451.

Consequently, this Court concludes that the Hospital lobby and outpatient waiting areas are neither a public forum nor a "limited public forum." In light of this conclusion, LIPT can only demonstrate a likelihood of succeeding on the merits if it can demonstrate that the Hospital's regulation of the nonpublic forum is not reasonable and is, in fact, "an effort to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46, 103 S.Ct. at 955.

**B.**

In *Cornelius*, the Court defined in greater detail what constitutes a "reasonable" restriction on access to a nonpublic forum. While earlier decisions had cautioned against utilizing "workplace disruption" as "a shibboleth, the mere recitation of which dictates constitutionality," *Frontiero v. Richardson*, 411 U.S. 677, 690, 93 S.Ct. 1764, 1772, 36 L.Ed.2d 583 (1973), *Cornelius* vests vast discretion with the agencies and officials who govern nonpublic forums:

> ... The Government's decision to restrict access to a nonpublic forum need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation. In contrast to a public forum, a finding of strict incompatibility between the nature of the speech or the identity of the speaker and the functioning of the nonpublic forum is not mandated.... Even if some incompatibility with general expressive activity were required, the CFC would meet the requirement because it would be administratively unmanageable if access could not be curtailed in a reasonable manner. Nor is there a requirement that the restriction be narrowly tailored or that the Government's interest be compelling. The First Amendment does not demand unrestrict-

ed access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message.... Rarely will a nonpublic forum provide the only means of contact with a particular audience. Here, as in *Perry* ..., the speakers have access to alternative channels, including direct mail and inperson solicitation outside the workplace, to solicit contributions from federal employees.

> The reasonableness of the government's restriction of access to a nonpublic forum must be assessed in the light of the purpose of the forum and all the surrounding circumstances....

> \* \* \* \* \* \*

> ... Although the avoidance of controversy is not a valid ground for restricting speech in a public forum, a nonpublic forum by definition is not dedicated to general debate or the free exchange of ideas. The First Amendment does not forbid a viewpoint-neutral exclusion of speakers who would disrupt a nonpublic forum and hinder its effectiveness for its intended purpose.

105 S.Ct. at 3453–54.

LIPT challenges the Hospital's blanket prohibition on solicitation as unreasonable, but the record is devoid of evidence to support its contentions. It suggests first that the prohibition on solicitation is based on an "undifferentiated fear or apprehension" that patients or their visitors will be disturbed. The hearing, deposition and affidavit testimony of Hospital doctors and administrators provides ample basis for concluding that the Hospital has sound medical reasons for wishing to keep the lobby and the outpatient waiting areas clear of individuals whose stated aim is to confront and lobby patients and families. A second argument is that enforcement of the solicitation policy is "content-based" because the Hospital bars LIPT while permitting its own voter registration efforts and AmeriTrust solicitation and while utilizing Hospital facilities to disseminate its views on the "privatization" issue. Under *Lehman*, *Perry*, and *Cornelius*, however, the

Hospital may conduct a voter registration drive and permit a bank to assist its employees without waiving its right to exclude activities—such as lobbying on political issues—which are of an entirely different, and disruptive, character. As for the contention that the Hospital impermissibly uses the disputed facilities to publicize its position on the "privatization" issue, the evidence fails to demonstrate that the Hospital has taken a formal position on privatization, that any form of proselytization, solicitation, or political communication directed at patients and their companions has ever been permitted in the Bell Greve lobby or outpatient areas, or that the Hospital has been the last bit inconsistent or arbitrary in imposing a blanket prohibition on expressive conduct in those areas.

This court finds no merit in LIPT's other objections to the regulation. The argument that no alternative forum exists for LIPT to mobilize opposition to the privatization proposal ignores those forums mentioned at the hearing by LIPT's chairperson, Frances Blevans—supermarkets, welfare offices, and door-to-door solicitations. It also ignores the availability of outdoor sites such as sidewalks adjacent to the Hospital. As the *Parkland I* panel observed, "just because [the] Hospital may be the best forum does not mean it is a constitutionally protected forum." 656 F.2d at 1180 (quoting district court opinion). The argument that the solicitation regulation unconstitutionally delegates unfettered discretion to a Hospital administrator ignores the fact that the relevant regulation, Paragraph V of the Solicitation Policy, is sufficiently detailed to satisfy even the requirements enunciated in *Parkland II*; more to the point, it ignores the fact that *Perry* upheld a system where access to the school mailbox system was simply controlled by the individual school principal, 460 U.S. at 47, 103 S.Ct. at 956, and that in *Cornelius* the court sustained an Executive Order which "delegated to the Director of the Office of Personnel Management the authority to establish criteria for determining appropriateness" of groups seeking to participate in the CFC. 105 S.Ct. at 3445.

Finally, LIPT's argument that individuals sitting in the lobby and waiting areas have a constitutionally-protected "right to receive information" under *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982), ignores *Pico*'s unique factual setting and the absence of a public forum issue in that case, and fails to indicate how a limitless "right to receive information" could be reconciled with the nonpublic forum cases discussed above.

■ Absent convincing evidence that the Hospital's solicitation policy is unreasonable, deference to the Hospital's expertise in patient care is mandated. In *Clark v. Community for Creative Non-Violence*, —— U.S. ——, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984), the Court held that "symbolic sleep" in Lafayette Park, facing the White House, that was intended to demonstrate the plight of the homeless could be banned altogether pursuant to the United States Park Service's duty to conserve park property. It declined to hold that *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), and other

> ... time, place, and manner decisions assign to the judiciary the authority to replace the Park Service as the manager of the Nation's parks or endow the judiciary with the competence to judge how much protection of park lands is wise and how that level of conservation is to be attained.

*Id.* at 3072. *Albertini* quoted this passage and added: "We are even less disposed to conclude that *O'Brien* assigns to the judiciary the authority to manage military facilities throughout the Nation." 105 S.Ct. at 2907. This approach also has been deemed appropriate with respect to welfare offices, *Brezenoff II*, 742 F.2d at 723–24, and train stations. *Gannett Satellite Information Network v. Metropolitan Transit Authority*, 745 F.2d at 775 n. 4. In light of the Hospital's nondiscriminatory conduct, such deference is equally appropriate here. LIPT has failed to show that

the regulation of the nonpublic forum in question is unreasonable.

## IV.

This action presents difficult constitutional questions and an unfortunate clash between two parties who both seek to guarantee continuing high-quality health care for the Hospital's low-income patients. On consideration, adhering as it must to higher courts' interpretations of the First Amendment, this Court enters judgment for the defendant.

IT IS SO ORDERED.