JEWS FOR JESUS, INC. and
Steven Silverstein

v.

MASSACHUSETTS BAY
TRANSPORTATION
AUTHORITY.

Civ. A. No. 90–10333–Z.

United States District Court,
D. Massachusetts.

Dec. 27, 1991.

Jay Alan Sekulow, James M. Henderson,
Sr., Eric A. Daly, Christian Advocates Serv-
ing Evangelism, Atlanta, Ga., David Kel-
ston, Friedman & Atherton, Boston, Mass.,
for Jews for Jesus, Inc. and Steven Silver-
stein.

Douglas T. Schwarz, Peckham, Lobel,
Casey, Prince & Tye, Jonathan P. Feltner,
Walter B. Prince, Peckman, Lobel, Casey,
Prince & Tye, Boston, Mass., for Massachu-
setts Bay Transp. Authority.

## MEMORANDUM OF DECISION

ZOBEL, District Judge.

Plaintiffs, Jews for Jesus, a not-for-profit corporation, and Steven Silverstein, branch leader of its Boston office, bring this action for a declaration that defendant Massachusetts Bay Transportation Authority's ("MBTA") Guidelines for Noncommercial Expressive Activity on MBTA Property (the "Guidelines") unconstitutionally restrict them from distributing free religious literature within defendant's transit stations. They assert that the stations are traditional public forums and that the Guidelines are unconstitutional regulations for such locations. They also challenge the Guidelines on equal protection clause, overbreadth and prior restraint grounds. Defendant counters that its stations are nonpublic forums and that the Guidelines are reasonable regulations. In the alternative it argues that the Guidelines are reasonable time, place and manner restrictions for a public or designated public forum.

*Findings of Fact*

I make the following findings of fact based on the evidence presented at trial.

Defendant operates commuter trains, subways and buses serving the metropolitan Boston region. For administrative purposes it divides its stations into two sections, free areas and paid areas. Within the paid areas, defendant's Guidelines flatly prohibit noncommercial expressive activity described as:

[c]onducting any of the following activities for political or non-profit purposes as defined by G.L. c. 180, § 4 and G.L. c. 55, § 1: solicitation of signatures; distribution of printed materials; handshaking or greeting individual transit patrons or members of the public; or publicly addressing transit patrons at a noise level greater than 85 decibels.

The ban also encompasses the free areas of twelve Boston stations.[1] Within the free areas of the remaining stations the Guidelines permit noncommercial expressive activity provided one receives prior authorization from defendant. To obtain authorization a person must telephone defendant, identify for whom the authorization is requested and the number of persons involved, as well as the location, time and activity.

Plaintiff, Jews for Jesus, is a not-for-profit California corporation engaged in conducting religious activity. Plaintiff Silverstein is branch leader of the Boston office of Jews for Jesus. Plaintiffs' activity—stationary leafletting within the free and paid areas—runs afoul of defendant's ban on the distribution of printed materials. Plaintiffs also violate the Guidelines to the extent they greet people while they leaflet. In addition, plaintiffs challenge the legitimacy of the prior authorization requirement.

The evidence at trial showed that, within the paid area, several activities occur other than those directly related to the running of trains. The scope of expressive and commercial activity varies, however, depending upon the individual stations' physical characteristics. For example, some stations, such as Government Center and Park Street, have kiosks in the paid areas that sell food, drinks, newspapers and magazines. On the other hand, defendant permits no other activity in Kenmore station, because of its small size. In a number of stations hawkers sell papers in the paid areas during rush hour. Noncommercial activities include musicians performing, with and without solicitation boxes, in the paid areas of many stations. Plaintiffs leafletted in the paid areas from 1983, apparently with defendant's permission at times, until the disputes giving rise to this litigation.[2] In addition, passengers engage in a range of First Amendment activity throughout the stations, including talking and greeting one another.

The evidence also showed that passengers file approximately 2500 claims against defendant each year. These claims often

---

1. The twelve stations are Science Park, North Station, Government Center, Park Street, Boylston, Copley (Inbound), Prudential, State Street (Northbound), Charles Street, Savin Hill, Symphony and Kenmore.

2. Under the terms of the Agreed Interim Order, plaintiffs are not now permitted to leaflet within the paid areas of the stations.

involve slip and fall accidents on platforms, stairs, or sometimes even into the tracks. The crowds that develop within stations during rush hour or as a result of special events or occasional service interruptions increase the number of accidents. The old age of many of the stations further exacerbates problems created by crowds in that the platforms are considerably narrower and smaller than in the more modern stations. In response, defendant has properly closed, temporarily, commercial establishments, or in rarer cases an entire station, when necessary to reduce overcrowding.

Defendant contends leafletting increases the risk of accidents in two respects. First, it says such activity disrupts passenger movement in the stations. Leafletting, as practiced by plaintiff, does not result in crowd flow problems, because a person may take a proffered leaflet without stopping or slowing down. Accepting (or declining) the leaflet does, however, require a slight diversion of attention. Although that diversion normally creates no hazard, when such activity occurs on or adjacent to stairs, escalators or turnstiles it may become dangerous. Also, in sufficiently crowded conditions the leafletter may be an unsafe obstacle. Nevertheless, most locations are at most times free from the conditions that make leafletting hazardous.

Second, defendant asserts leafletting leads to litter, which poses a threat to safety. Litter can cause slip and fall accidents. In addition, wind generated by the trains may blow litter into the train tunnels where it can clog switching devices. Plaintiffs have a policy of picking up their literature discarded improperly by others. Defendant does not dispute this. No evidence shows that plaintiffs have failed in this regard.

With respect to the requirement of prior authorization I make the following findings. Defendant requires the prior authorization as a means to allocate space on a first-come first-serve basis, as well as a planning tool so that it can anticipate the location of noncommercial expressive activity. The requirement applies to all persons, individuals or groups, desiring to engage in such activity. Because a person or group can request authorization from a pay

telephone at the station moments prior to engaging in noncommercial expressive activity, this requirement of the Guidelines does not assist defendant in planning for its policing needs.

*Discussion*

1. The Ban on Expressive Activity in the Paid Areas.

The parties vigorously dispute the appropriate public forum label to apply to the stations—traditional public forum, the designated (general or limited) public forum, or the nonpublic forum. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45–46, 103 S.Ct. 948, 954–955, 74 L.Ed.2d 794 (1983). I need not decide that question, however, because the Guidelines are unconstitutionally overbroad even in the context of a nonpublic forum. *Board of Airport Comm'rs v. Jews for Jesus, Inc.,* 482 U.S. 569, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987).

 In ruling on a facial overbreadth challenge to a law the Court must determine whether the law at issue reaches a substantial amount of constitutionally protected speech. *City of Houston v. Hill,* 482 U.S. 451, 458, 107 S.Ct. 2502, 2508, 96 L.Ed.2d 398 (1987) (quoting *Hoffman Estates v. The Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982)). Specifically, an enactment that regularly restricts protected speech is overbroad. *Id.* In discerning the reach of the particular law the Court must also consider any limiting constructions proffered by the defendant. *Ward v. Rock Against Racism,* 491 U.S. 781, 795–96, 109 S.Ct. 2746, 2756–57, 105 L.Ed.2d 661 (1989) (quoting *Hoffman Estates,* 455 U.S. 489, 494 n. 5, 102 S.Ct. 1186, 1191 n. 5, 71 L.Ed.2d 362 (1982)). If the law still encompasses a substantial amount of protected speech despite any appropriate narrowing, then the challenge succeeds and the law must fall. *See Whiting v. Town of Westerly,* 942 F.2d 18, 21 (1st Cir.1991).

 Defendant's absolute ban on passengers greeting others or distributing literature for political or nonprofit purposes burdens substantial speech unrelated to defen-

dant's legitimate public safety objectives.[3] For example, Mr. Silverstein violates the rule by greeting passengers prior to handing them a leaflet in the Park Street station (notwithstanding the fact that other persons hawk newspapers there). Similarly, a politician, who while waiting for a train greets passengers (friends or strangers) for a political purpose, also contravenes the Guidelines. The evidence demonstrates no threat to public safety, the functioning of the transit system or any other legitimate government interest, when a lone individual engages in such activity. In fact, "no conceivable government interest" justifies such a sweeping ban on speech in the paid areas. *Jews for Jesus,* 482 U.S. at 575, 107 S.Ct. at 2572; *see also City of Houston v. Hill,* 482 U.S. at 461–62, 107 S.Ct. at 2509–10 (ordinance punishing spoken words and not limited to fighting words, unconstitutionally overbroad).

Similarly, defendant's ban on leafletting within the paid areas suppresses large amounts of speech that endangers no one. First, the simple act of distributing some printed material creates no threat to public safety. For example, if, while waiting for a train, plaintiff Silverstein distributes religious literature to a passenger he contravenes the Guidelines without creating a safety hazard. Second, larger scale distributions do not, necessarily, place the public at risk. As the Supreme Court observed in *United States v. Kokinda,* —— U.S. ——, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990), even while walking one need not break stride to mechanically take a leaflet from another. *Kokinda,* 110 S.Ct. at 3123. By comparison, solicitation, an activity the Court permitted the Post Office to ban, demands a response, impedes traffic flow and requires monitoring. *Id.* Simply put, a sole leafletter presents no threat to public safety within most of defendant's stations absent other conditions—rush hour crowds,[4] improper positioning, on a stairway for example, or a significant number of other leafletters.

*Cf. Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 810, 104 S.Ct. 2118, 2131, 80 L.Ed.2d 772 (1984) (posting of a single sign on municipal utility poles creates "visual blight," thus absolute ban upheld). The factual circumstances that transform plaintiffs' activity into a threat to public safety exist only in specified stations at specified times; most stations during most hours of operation are not so crowded. Moreover, the range of nontransit activities occurring within defendant's stations rebuts its contention that leafletting threatens public safety. Indeed, the arguments defendant advances apply with similar force to permitted activities, including the newspaper hawkers and the musicians.

Contrary to defendant's contention, the Supreme Court's decisions in *Kokinda* and *Heffron* do not support defendant's Guidelines. Neither of those opinions upheld sweeping bans on leafletting or speech, such as the one at issue in this case. The plurality that upheld the solicitation ban in *Kokinda* distinguished the regulation at issue in that case from one banning mere leafletting, because solicitation, in contrast to leafletting, requires a response that might cause disruptions. *Kokinda,* 110 S.Ct. at 3123–24. Although the Court upheld a ban on roaming solicitors and leafletters at a state fair in *Heffron,* it did so because the plaintiffs in *Heffron* could arrange for a booth at the fair to conduct solicitation and leaflet distribution. *Heffron,* 452 U.S. at 654–55, 101 S.Ct. at 2567–68. In contrast, defendant denies plaintiffs access to the paid areas of all stations and to the free areas of many of the most "desirable" stations, e.g. the downtown Boston stations. Moreover, while the fairground rule challenged in *Heffron* permitted engaging fair attendees in discussion at any location within the fairground, *Heffron,* 452 U.S. at 654–55, 101 S.Ct. at 2567–68, the Guidelines even prohibit that activi-

---

**3.** The parties agree that defendant's goal of controlling the flow of people within its stations in order to protect public safety may justify restrictions on first amendment activity, *Heffron v. Int'l Soc'y for Krishna Consciousness,* 452 U.S. 640, 651, 101 S.Ct. 2559, 2565, 69 L.Ed.2d 298 (1981), but they dispute the threat to safety, if any, posed by plaintiffs' activities.

**4.** Even plaintiffs' counsel acknowledged that a ban on rush hour leafletting could be a reasonable regulation.

ty if it is for political or nonprofit purposes.[5]

Finally, defendant justifies its ban on the grounds that leafletting breeds litter. Long ago, however, the Supreme Court decided this issue: government must punish the litterer not the leafletter. *Schneider v. State*, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939). More recently, the Court noted that reducing litter by banning all leafletting suppresses too much speech. *Rock Against Racism*, 491 U.S. at 799 n. 7, 109 S.Ct. at 2758 n. 7. Furthermore, the evidence at trial did not demonstrate a causal connection between plaintiffs' distribution of printed material and litter-related safety problems sufficient to ban all such activity.

Accordingly, under the Supreme Court's decision in *Jews for Jesus*, defendant's ban is unconstitutionally overbroad. There, the Court struck a regulation banning all "First Amendment activities" at Los Angeles International Airport. *Jews for Jesus*, 482 U.S. at 574, 107 S.Ct. at 2572. Admittedly, the regulations at issue here sweep less broadly. Nevertheless, the difference is not dispositive. There, as in this case, the regulations banned large amounts of expressive activity largely unconnected with the government's legitimate concern, promoting public safety via adequate crowd control. *Id.* That the Guidelines "only" restrict large amounts of protected speech rather than the entire range of speech protected by the First Amendment fails to distinguish this case. *Community for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1396–97 (D.C.Cir.1990) (concurring opinion). Nor has defendant proffered any limiting construction that saves the Guidelines.

Notwithstanding such constitutional protections, the defendant always enjoys the authority to halt temporarily activity at its stations that threatens public safety. The evidence at trial established that defendant

has wisely and judiciously exercised this authority in the past by closing commercial establishments when necessary. It may do the same, if necessary, with respect to core First Amendment activity.

## 2. Prior Authorization Required in Free Areas.

 The Guidelines also require prior telephone authorization before a person or group engages in "non-commercial expressive activity" within the free areas of T-stations. Guidelines I(2), II. An enactment that authorizes public officials to deny use of a public place in advance of expression is a prior restraint, *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553, 95 S.Ct. 1239, 1243, 43 L.Ed.2d 448 (1975), and as such is presumptively unconstitutional. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225, 110 S.Ct. 596, 604, 107 L.Ed.2d 603 (1990) (quoting *Southeastern Promotions*, 420 U.S. at 558, 95 S.Ct. at 1246). Nevertheless, permit requirements may pass constitutional muster as reasonable time, place and manner regulations. *Heffron*, 452 U.S. at 647 n. 10, 101 S.Ct. at 2564 n. 10.

 The permit requirement in the instant case, however, is overbroad in two respects. First, ordinary speech may not be conditioned upon obtaining a prior license from the government. *Thomas v. Collins*, 323 U.S. 516, 539, 65 S.Ct. 315, 326, 89 L.Ed. 430 (1945). Just as no government interest justifies an absolute ban on greeting others for political or nonprofit purposes, no interest justifies requiring prior authorization to do the same in the free areas of the stations.[6] *Cf. Jews for Jesus*, 482 U.S. at 575, 107 S.Ct. at 2572.

Second, the permit requirement fails to distinguish between individual activity on the one hand and parade type activity on the other hand. Prior authorization enables the defendant to arrange any neces-

---

**5.** Although the Guidelines do not expressly prohibit discussion, they do prohibit plaintiffs from "greeting" patrons, a usual prerequisite to a discussion.

**6.** Obviously, this does not prevent defendant from requiring persons to move along when,

while greeting passengers, they pose a safety threat because of where they are standing. In this situation defendant regulates objectionable conduct, e.g. blocking the escalator, rather than protected speech. *See City of Houston v. Hill*, 482 U.S. at 462 n. 11, 107 S.Ct. at 2510 n. 11.

sary police coverage, a significant government interest. *Cox v. New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941); *Eastern Connecticut Citizens Action Group v. Powers,* 723 F.2d 1050, 1056 (2d Cir.1983). An appropriately tailored licensing scheme for large organized activities, such as parades, passes constitutional scrutiny, even in traditional public forums. *Cox,* 312 U.S. at 576, 61 S.Ct. at 765; *see also Quaker Action Group v. Morton,* 516 F.2d 717, 735 (D.C.Cir.1975) (two-day advance notice requirement approved). Clearly in the case of a lone leafletter, however, no such changes in police activity are necessary and a prior authorization requirement is unconstitutional. *See Turner,* 893 F.2d at 1392, 1396–97 (majority & concurring opinions). Indeed, the Guidelines implicitly acknowledge that defendant may not make staffing adjustments in response to issuing permits because one may obtain prior authorization by phoning defendant from a station moments before engaging in noncommercial expressive activity. Thus, in practice, the authorization requirement simply stands as a hurdle blocking free expression, because to avoid the requirement risks ejection (defendant's normal practice), while to obtain authorization serves no purpose in many instances.

Defendant also justifies prior authorization as a mechanism to allocate access to its stations on a first-come first-serve basis. But, defendant may allow access in this manner without imposing an unconstitutional prior restraint.

*Conclusion*

For the reasons set forth above, the Guidelines are unconstitutionally overbroad. Plaintiffs satisfy the prerequisites for injunctive relief, *Elrod v. Burns,* 427 U.S. 347, 373–74, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976); therefore, judgment may be entered enjoining the defendant Massachusetts Bay Transportation Authority from enforcing its Guidelines for Noncommercial Expressive Activity on MBTA Property.