February 5, 1993

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1277

JEWS FOR JESUS, INC., and STEVEN SILVERSTEIN,

Plaintiffs, Appellees,

v.

MASSACHUSETTS BAY TRANSPORTATION AUTHORITY,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Selya, Circuit Judge,

Coffin, Senior Circuit Judge,

and Boudin, Circuit Judge.

Walter B. Prince with whom Deborah A. Tootalian was on brief for

appellant.
James M. Henderson with whom Thomas Patrick Monaghan, Walter M.

Weber, John G. Stepanovich, Mark N. Troobnick, Jay Alan Sekulow, and

Keith A. Fournier were on brief for appellees.

February 5, 1993

COFFIN, Senior Circuit Judge. This appeal arises from a

challenge to the Massachusetts Bay Transit Authority's ("MBTA" or

"Authority") Guidelines for Noncommercial Expressive Activity on

MBTA Property. Plaintiffs Jews for Jesus and an individual

member of the organization contend that the Guidelines improperly

restrict their First Amendment right of free speech. The

district court agreed and invalidated the offending provisions of

the Guidelines. The MBTA then appealed. We affirm the

invalidation of the complete ban on expressive activity in

designated areas but reverse the invalidation of the prior

authorization requirement.

I.

The defendant MBTA is a municipal corporation that operates

the subway system serving the metropolitan Boston region. The

subway system contains 80 train stations. Each station is

divided into two sections, the "free" area outside the turnstiles

and the "paid" area inside the turnstiles, leading to the trains.

The Authority promulgated a set of Guidelines to govern

noncommercial expressive activity in the subway system. The

Guidelines define such activity as:

[c]onducting any of the following activities for
political or non-profit purposes as defined by G.L. c.
180, 4 and G.L. c. 55, 1: solicitation of
signatures; distribution of printed materials;
handshaking or greeting individual transit patrons or
members of the public; or publicly addressing transit
patrons at a noise level greater than 85 decibels.

The Guidelines ban noncommercial expressive activity from the

paid areas of all the subway stations and the free areas of

twelve stations.1 Within the free areas of the remaining

stations, the Guidelines require prior authorization to engage in

noncommercial expressive activity.

Plaintiff Jews for Jesus is a not-for-profit corporation

that conducts religious activity. Plaintiff Steven Silverstein

is the branch leader of the Boston office of Jews for Jesus.

Plaintiffs' evangelistic activity consists primarily of

distributing free religious literature in public places. For

many years prior to the commencement of this suit, they

distributed materials throughout the paid areas of the transit

system.2

When the MBTA began to prohibit leafletting in the paid

areas, plaintiffs mounted a facial challenge to the Guidelines.

Their primary contention is that the Guidelines impose a ban on

leafletting, a form of protected speech, without justification.

The Authority counters that the regulations are a reasonable

infringement of First Amendment rights and are necessary to

preserve the system's transportation function. In particular,

1 The twelve stations are Science Park, North Station,
Government Center, Park Street, Boylston, Copley (Inbound),
Prudential, State Street (Northbound), Charles Street, Savin
Hill, Symphony, and Kenmore. The MBTA considers these stations
to lack sufficient space to permit any noncommercial expressive
activity.

2 The previous Guidelines for Political, Religious or
Educational Activity prohibited leafletting on only the subway
trains. By the commencement of this lawsuit, the MBTA
interpreted these guidelines as banning leafletting from the paid
areas as well and sought to eject plaintiffs from its stations
for violating the ban. The current Guidelines were adopted after
this suit began.

-3-

the MBTA points to a concern for public safety to justify the

restriction on leafletting.

Plaintiffs do not contest the legitimacy of public safety as

a government concern. Instead, the parties dispute the extent to

which plaintiffs' activities may threaten public safety. Jews

for Jesus, Inc. v. Massachusetts Bay Transp. Auth., 783 F. Supp.

1500, 1503 n.3 (D. Mass. 1991).

Following a consolidated preliminary injunction hearing and

trial on the merits, the district court concluded that neither

handshaking and greeting nor leafletting in fact threaten public

safety in the Boston subway system. Id. at 1503. Without

investigating solicitation of signatures or public address, the

court nevertheless invalidated the ban on all noncommercial

expressive activities because of the regulation's sweeping

restriction of protected speech. In so doing, the court applied

a tenet of overbreadth doctrine that permits facial invalidation

of a regulation whose reach beyond properly prohibited speech is

"substantial." Broadrick v. Oklahoma, 413 U.S. 601, 615 (1973).

The court also invalidated the authorization requirement as an

impermissible prior restraint that did not promote public safety

concerns.

The court left intact the Guidelines' provisions regarding

expressive activity in areas where such activity was not banned.

These regulations protect public safety by establishing the

standards of conduct for the performance of permitted activity as

well as the penalty for violation of the restrictions.

-4-

-5-

II.

On appeal, the MBTA contends that the district court applied

an erroneous standard to invalidate the Guideline provisions.

Our review, therefore, necessarily is, in many respects, de novo.

Senter v. General Motors Corp., 532 F.2d 511 (6th Cir. 1976); see

Sweeney v. Bd. of Trustees, 604 F.2d 106, 109 n.2 (1st Cir.

1979). The district court's factual findings concerning the

operation of and the activities within the subway system,

however, are reviewed only for clear error. Holmes v. Bateson,

583 F.2d 542, 552 (1st Cir. 1978). Our examination of the record

demonstrates that the court's findings are amply supported, and,

accordingly, we adopt them for our analysis.

A. Ban on Noncommercial Expressive Activities

The district court struck down the Authority's ban on

noncommercial expressive activities for sweeping too broadly and

being, in fact, unrelated to the MBTA's legitimate public safety

concerns. In reviewing the court's decision, we are concerned

not so much with the technical use of the overbreadth doctrine,

which often is confined to the ability of a party engaging in

unprotected activity to raise the rights of others whose

activities are protected, City Council v. Taxpayers for Vincent,

466 U.S. 789, 798 (1984), as with the underlying analysis of the

court that the MBTA did not justify the imposition of an absolute

ban.

The MBTA recommends that we analyze the Guidelines pursuant

to the public forum doctrine. Forum analysis strikes the balance

-6-

between the public's right of access to public property for

expressive activity and the government's interest in limiting the

property's use based on the character of the property at issue.

Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37,

44 (1983). Fewer content-based restrictions are permissible in a

public forum, a location either traditionally or by designation

open to public discourse, than in a nonpublic forum, a location

traditionally closed to such discourse. Id. at 45. As the

Supreme Court has explained:

[D]istinctions in access on the basis of subject matter
and speaker identity . . . may be impermissible in a
public forum but are inherent and inescapable in the
process of limiting a nonpublic forum to activities
compatible with the intended purpose of the property.
The touchstone for evaluating these distinctions is
whether they are reasonable in light of the purpose
which the forum at issue serves.

Id. at 49. Applying this framework, the MBTA asserts that the

alleged historical unavailability of the subway stations for

public discourse renders them nonpublic fora and that the

Guidelines are a reasonable regulation within this context.

The nature of the forum, however, traditionally has been

important only when the government tries to restrict access

according to the content of the message. In any kind of forum,

the government may impose certain restrictions so long as they

are not based on the content of the speech. Id. at 45.

We find it unnecessary to decide whether the Boston subway

stations are public or nonpublic fora because the MBTA's

Guidelines are content neutral. First, they restrict only the

mode of expression, not the message. Second, they are aimed at

-7-

legitimate government concerns. "A regulation that serves

purposes unrelated to the content of expression is deemed

neutral, even if it has an incidental effect on some speakers or

messages but not others." Ward v. Rock Against Racism, 491 U.S.

781, 109 S. Ct. 2746, 2754 (1989). Accordingly, we assess the

activities ban as a content neutral regulation. See United

States v. Kokinda, 497 U.S. 720, 110 S. Ct. 3118, 3125-26 (1990)

(Kennedy, J., concurring) (rejecting use of forum analysis where

content neutral, reasonable time, place, and manner evaluation is

available).

A content neutral restriction may limit speech if it

reasonably regulates the time, place, and manner of expression

and is tailored narrowly to serve a substantial government

interest. Perry Educ. Ass'n, 460 U.S. at 45-46. Our review thus

focuses on two critical inquiries: "whether [the Authority's]

interest is sufficiently substantial to justify the effect of the

ordinance on [plaintiffs'] expression, and whether that effect is

no greater than necessary to accomplish the [Authority's]

purpose." City Council, 466 U.S. at 805; Shad v. Mount Ephraim,

452 U.S. 61, 71 (1981).

We realize that in recent decisions, the Supreme Court has

applied the nonpublic forum standard of reasonableness to content

neutral restrictions on free speech. See, e.g., Int'l Society

for Krishna Consciousness, Inc. ("ISKCON") v. Lee, 112 S. Ct.

2701, 2708 (1992); Kokinda, 110 S. Ct. at 3121. Traditionally,

however, the Court has employed the reasonableness test only for

-8-

content-based restrictions in nonpublic fora. See, e.g.,

Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S.

788, 809 (1985) (applying reasonableness test to exclusion of

political advocacy organizations from charity drive aimed at

federal employees); Perry Educ. Ass'n, 460 U.S. at 49 (applying

same test to exclusion from school mail network based on identity

of proposed speaker); and Greer v. Spock, 424 U.S. 828, 831, 839

(1976) (applying same test to exclusion of partisan political

speech from military base). Regardless, because that test

requires the challenged regulations to be reasonable in light of

the forum's purpose and the surrounding circumstances, see, e.g.,

ISKCON, 112 S. Ct. at 2705, the two tests merge or collapse into

one another in cases where, as here, the government has failed to

present a credible reason why the regulations further the forum's

purpose. We now consider each form of activity in turn.3

1. Leafletting

The Authority contends that its concern for passenger safety

justifies the ban on leafletting. It argues that leafletting

threatens public safety by disrupting passenger flow and by

creating litter. In particular, it claims that leafletting

causes obstacles that, inter alia, encourage pickpocketing and

more adversely affect handicapped patrons who are slower to

adjust to obstacles. It further contends that litter causes

accidents and fires or other disruptions in service when paper

3 On appeal, the Authority concedes that the blanket
restriction against greeting and handshaking is unreasonable. We
therefore consider only the remaining restricted activities.

-9-

clogs switching devices on the tracks. Public safety, of course,

is a substantial government concern that can justify some

incidental infringement of protected speech. ISKCON, 112 S. Ct.

at 2708-09.

We are mindful that "[a] ban on handbilling . . .

suppress[es] a great quantity of speech that does not cause the

evils that it seeks to eliminate." Ward, 109 S. Ct. at 2758 n.7

(citing Martin v. City of Struthers, 319 U.S. 141, 147-49

(1943)). The Authority thus bears a heavy burden in justifying

its absolute ban on leafletting, an activity that long has

enjoyed the full protection of the First Amendment. Lovell v.

City of Griffin, 303 U.S. 444, 450-52 (1938). Indeed, the

religious nature of plaintiffs' leafletting increases the MBTA's

burden; leafletting is a "form of religious activity [that]

occupies the same high estate under the First Amendment as do

worship in churches and preaching from the pulpits." Murdock v.

Pennsylvania, 319 U.S. 105, 108-09 (1943). The record in this

case amply supports the district court's determination that the

perceived threat to public safety does not justify a complete ban

on leafletting in the designated areas.

The Supreme Court has dismissed the danger to traffic

congestion as a justification to ban leafletting. The Court has

explained that "`[t]he distribution of literature does not

require that the recipient stop in order to receive the message

the speaker wishes to convey.'" ISKCON, 112 S. Ct. at 2713-14

(O'Connor, J., concurring) (quoting Kokinda, 110 S. Ct. at 3123).

-10-

Bottlenecks, therefore, are unlikely to develop. Because

leafletting is a particularly unobtrusive form of expression, the

Court recently invalidated a ban on leafletting, even within a

nonpublic forum. Lee v. ISKCON, 112 S. Ct. 2709, 2709 (1992)

(per curiam); see ISKCON, 112 S. Ct. at 2708 (finding airport to

be nonpublic forum).

The Authority next contends that leafletting causes litter-

related hazards. The Supreme Court, however, long has recognized

that littering is the fault of the litterbug, not the leafletter.

Schneider v. State, 308 U.S. 147, 162 (1939). The normally

appropriate response to problems caused by litter, therefore, is

to punish the litterbug.

The record, moreover, does not support the Authority's

fears. Over a period of 18 months, the Authority's accident and

incident report listed more than 250 accidents, but it did not

indicate the type or cause of any of the reported events.

Defendant's Trial Exhibit 23A. These numbers alone do not

support generalizations that noncommercial leafletting causes

accidents. Besides, in accordance with the Guidelines,

plaintiffs regularly pick up leaflets that have been discarded

improperly by transit patrons. Indeed, the MBTA employees who

testified at trial did not know of any accidents, crimes, or

other incidents in which plaintiffs were implicated. We

therefore affirm the district court's determination that the

evidence did not demonstrate a causal connection between

leafletting and litter-related safety problems.

-11-

The record reveals a myriad of other nontransit activity in

the stations that further weakens the justification for the

leafletting ban. See Grayned v. Rockford, 408 U.S. 104, 116

(1972) (holding that crux of time, place, and manner analysis is

"whether the manner of [banned] expression is basically

incompatible with the normal activity of a particular place at a

particular time"). Passengers bring in paper and food items for

immediate consumption. Vendors, including wandering newspaper

hawkers, sell newspapers, magazines, food, and drink within the

stations. Businesses leave promotional flyers unattended.

Musicians set up portable stations to perform, sell tapes, and

solicit contributions. The MBTA deliberately has invited into

the subway system a range of expressive activities that can

produce problems similar to those it attributes to leafletting.4

The condoned presence of these activities indicates that the

subway system can accommodate peaceful leafletting. See ISKCON,

112 S. Ct. at 2713-14 (O'Connor, J., concurring) (striking down

ban on leafletting where activity reasonably is compatible with

"shopping mall" environment of airport). We thus affirm the

district court's conclusion that litter does not justify the

complete ban on leafletting.

2. Solicitation of Signatures

4 As Edward Manning, the Superintendent of the Light Rail
Department, testified, passengers "can slip easily on anything

that would be discarded on the platform." Tr. Vol. I at 64.
(emphasis added). Indeed, Daniel Breen, the Building Structures
Division Engineer, stated his opinion that concession stands and
newspaper vendors also should be banned because of the "mess and
the safety problems" they cause. Tr. Vol. I at 43, 49.

-12-

Although the parties did not discuss this form of

expression, we realize that the Supreme Court has accorded the

solicitation of signatures for petitions a high level of

protection because it "involves both the expression of a desire

for political change and a discussion of the merits of the

proposed change." Meyer v. Grant, 486 U.S. 414, 421, 425 (1988).

It therefore "involves the type of interactive communication

concerning political change that is appropriately described as

`core political speech.'" Id. at 421-22. When restricting this

kind of speech, the government bears a greater burden to justify

its ban. Id. at 425; see also Burson v. Freeman, 112 S. Ct.

1846, 1857 (1992) (warning that ban against electioneering can

become "an impermissible burden" the farther from the polls it

extends).

Yet the MBTA has offered no support for its ban on

solicitation of signatures. The argument and the evidence

presented focus solely on the dangers to public safety posed by

leafletting. Because we do not see how peaceful solicitation of

signatures clashes with the multipurpose environment of the

subway system, we "cannot accept that a total ban on that

activity is reasonable without an explanation as to why such a

restriction `preserve[s] the property' for the several uses to

which it has been put." ISKCON, 112 S. Ct. at 2714 (O'Connor,

J., concurring) (quoting Perry Educ. Ass'n, 460 U.S. at 50-51).

Even extending the Authority's concern for public safety to

solicitation, we are not persuaded that the inferred risks would

-13-

justify the ban on solicitation of signatures. First,

solicitation of signatures does not produce litter. The

solicitor does not give the petition to a passenger to keep but

is careful to hold on to every page of the petition. Second,

because no money changes hands, the risk of fraud, a major

concern justifying bans on solicitation of funds, ISKCON, 112 S.

Ct. at 2708, is absent. Third, although solicitation is more

disruptive of passenger flow because it invites a passenger to

stop to read the petition before deciding whether to add her

name, it is no more disruptive of traffic than other activities

in the transit system. Both the hawking of newspapers and the

playing of music create crowds as passengers stop to buy

newspapers, listen to a performance, or make donations to a

musician. In the absence of contrary evidence from the MBTA, the

peaceful solicitation of signatures appears compatible with the

environment of the Boston subway system.

3. Public Address

Finally, we turn our attention to the ban against public

address. As with solicitation, we conclude that the complete

lack of an explanation and evidence to support the ban on public

address compels its invalidation. The Authority confines public

address in the free areas to decibel levels below 95. It

evidently has determined that 95 decibels is the level above

which public safety is endangered. In any event, the MBTA has

not explained why, in light of this available and uncontested

restriction, the absolute ban is necessary.

-14-

4. Other Guideline Provisions

The Authority, of course, may tailor the Guidelines narrowly

to achieve its interest in public safety. For example,

plaintiffs concede that the MBTA legitimately may ban expressive

activity during especially crowded peak hours when the dangers to

the public are greater.

Ironically, the Guidelines already contain narrowly drawn

time, place, and manner restrictions that satisfy the MBTA's

specific concerns. The Guidelines forbid littering, leaving

literature unattended, and interfering with the safety of the

passengers or the operation of the subway trains. In addition,

to minimize the risk of accidents, the MBTA maintains a 15-foot

safety zone around elevators, stairwells, kiosks, turnstiles, the

edge of any train platform, and other high risk structures. It

also bans expressive activity from areas less than 15 feet wide.

The Guidelines authorize the ejectment of any person who violates

these prohibitions. Finally, the MBTA may cancel authorization

of noncommercial expressive activity for a reasonable time when

public safety or the operation of the transit system so require.

Particularly with unchallenged time, place, and manner

regulations in place to protect the Authority's interest, the

complete ban on noncommercial expressive activity in the paid

areas and free areas of earmarked stations cannot stand.

We add that we are not unaware of the special conditions and

dangers of subway operation. We are, however, dealing with a

continuing injunction. Thus, to the extent that existing

-15-

regulations prove inadequate, the Authority may adopt, if

justified, appropriately tailored regulations going beyond those

we have sustained, if and when the evidence, including changed

conditions, warrants such restrictions.

B. Prior Authorization Requirement

The Guidelines require a person to obtain authorization

before engaging in noncommercial expressive activity. To obtain

authorization, a person must telephone the Authority and indicate

for whom the authorization is requested, the number of

individuals involved, and the proposed location, time, and

activity. When a person receives permission to engage in

noncommercial expressive activity, she also receives a control

number. The Authority charts the number on the appropriate

station diagram and transmits the information to the station so

that the personnel there can oversee the activity. The request

line is available 15 and 1/2 hours each day, seven days a week.

The district court voided the authorization requirement as

an unconstitutional prior restraint. It explained that the MBTA

could not require a license to engage in ordinary speech like

handshaking or greeting and that the authorization requirement

did not promote the Authority's avowed interests in public safety

and evenhanded access to the subway stations for First Amendment

activities. We disagree with the court's conclusions and,

therefore, reverse the invalidation of the authorization

requirement.

-16-

Although it is true that a regulation allowing the

government to deny use of its property "in advance of actual

expression" is a prior restraint, Southeastern Promotions, Ltd.

v. Conrad, 420 U.S. 546, 553 (1975), not all prior restraints

transgress the First Amendment. Id. at 558. A prior restraint

system is permissible if it contains certain safeguards designed

to protect against censorship. Freedman v. Maryland, 380 U.S.

51, 58-60 (1965). Where the prior restraint is content neutral,

the regulations must limit the time for issuing authorization and

must permit prompt judicial review. Id., construed in FW/PBS,

Inc. v. City of Dallas, 110 S. Ct. 596, 606-07 (1990).

The Guidelines satisfactorily incorporate these safeguards.

The Authority responds to each request at the time it is made.

The Guidelines further delineate the situations in which

authorization may be denied: when the desired location is

unavailable; when the planned activity endangers public safety;

and when the planned activity constitutes prohibited conduct.5

The applicant may appeal a denial of authorization, and the

filing of an appeal entitles the claimant to a hearing in

accordance with Mass. Regs. Code tit. 801, 1.02.

Given these safeguards, it is more appropriate to scrutinize

the permit system as a time, place, and manner regulation.

5 Prohibited conduct includes unlicensed commercial
activity, distribution of food and drink, posting bills or
otherwise affixing materials to an MBTA structure, setting up
tables or portable equipment, carrying large placards or signs
affixed to a pole, discarding or leaving unattended any printed
material, and producing or amplifying sound to a level greater
than 95 decibels.

-17-

Heffron, 452 U.S. at 647 n.10, 649. The authorization

requirement is "not open to the kind of arbitrary application

that [the Supreme Court] has condemned as inherently inconsistent

with a valid time, place, and manner regulation because such

discretion has the potential for becoming a means of suppressing

a particular point of view." Id. at 649. Like the regulations

upheld in Heffron, id., the Guidelines allocate space on a first

come, first served basis, without regard to the messages

presented. The Authority does not even inquire about the

contents of the message.

As we noted above, a content neutral time, place, and manner

regulation passes constitutional muster if it is tailored

narrowly to serve a significant government interest. As part of

this inquiry, we also consider whether the regulation forecloses

alternative channels of communication. Perry Educ. Ass'n, 460

U.S. at 45-46. The authorization requirement satisfies these

strictures.

The Guidelines leave available ample channels of

communication for plaintiffs' message. Plaintiffs may

disseminate their leaflets in the streets, parks, and sidewalks

adjacent to the train stations. Within the transit system, if

plaintiffs are denied authorization in one location, they may

seek to use a different one or to reserve a different time.

The Authority asserts that the government interests

protected through the authorization requirement include ensuring

public safety and equal access for all who wish to engage in

-18-

noncommercial expressive activity. In particular, the prior

authorization enables the Authority to arrange necessary police

coverage, an undeniably substantial government interest. Cox v.

New Hampshire, 312 U.S. 569, 576 (1941).

The question remains whether the prior authorization scheme

is tailored narrowly to advance the Authority's legitimate

interests. The district court answered this question negatively.

It reasoned that advance warning for police deployment is

unnecessary for a lone leafletter and that, for a larger

gathering, the Guidelines do not provide sufficient lead time to

redeploy the Authority's security forces. This reasoning

overlooks the fact that "the requirement of narrow tailoring is

satisfied `so long as the . . . regulation promotes a substantial

government interest that would be achieved less effectively

absent the regulation.'" Ward, 109 S. Ct. at 2758 (quoting

United States v. Albertini, 472 U.S. 675, 689 (1985)); see

Cornelius, 473 U.S. at 808.

The authorization scheme effectively promotes the MBTA's

interests. With respect to the lone leafletter, the district

court did not take into account the cumulative effect that a

number of lone leafletters converging on the same station can

have on public safety. The authorization scheme enables the

Authority to avoid scheduling conflicts among different

applicants and to contain the amount of activity at a level that

does not interfere with public safety.

-19-

The requirement also copes with the problems attending the

staging of a large rally or gathering. In such an event, the

Authority reasonably could deny permission because of a risk to

public safety, if it does not have adequate time to deploy its

personnel. The Authority, moreover, boasts the ability to

redeploy its personnel quickly because it maintains a number of

police officers throughout the system, who can be diverted to a

station on short radio notice. The authorization scheme thus

enables the MBTA to monitor the activity in the system at any

time so that it can prevent and respond to problems affecting the

public. These benefits are sufficient to uphold the

authorization requirement. See Cox, 312 U.S. at 576.

III.

To summarize, we affirm the invalidation of the ban on

noncommercial expressive activity from designated areas and

reverse the invalidation of the prior authorization requirement.

Solicitation of signatures, leafletting, handshaking or greeting,

and public address all may occur within the paid and free areas

of the transit stations in accordance with the existing time,

place, and manner restrictions (e.g., requiring leafletters to

stay 15 feet away from the platform's edge) and the authorization

requirement. These provisions now apply to the paid areas as

well as to the free areas. If the distance restrictions preclude

activity in any of the free or paid areas, a complete ban on all

noncommercial expressive activity may apply to the affected area.

-20-

Affirmed in part and reversed in part. No costs.

-21-